[L. A. No. 2952. In Bank.—March 30, 1912.]

In the Matter of the Estate of ELIAS J. BALDWIN, Deceased, and In re Proceedings therein on Petition of BEATRICE ANITA BALDWIN (otherwise known as Beatrice Anita Turnbull), a Minor, for Partial Distribution.

PRACTICE—JURY TRIAL—WHEN COURT MAY DIRECT VERDICT.—In a trial by jury the court may direct the jury to return a verdict for the defendant, unless there be substantial evidence tending to prove in favor of the plaintiff all the controverted facts necessary to establish his case. In other words, a directed verdict is proper whenever, upon the whole evidence, the judge would be compelled to set a contrary verdict aside as unsupported by the evidence.

ESTATE OF DECEASED PERSONS — MARRIAGE — CONSENT FOLLOWED BY MUTUAL ASSUMPTION OF MARITAL RIGHTS, DUTIES, AND OBLIGATIONS —INSUFFICIENT EVIDENCE TO ESTABLISH MARRIAGE.—In a proceeding for the partial distribution of the estate of a testator, instituted by a person claiming to be his pretermitted child and the offspring of a marriage entered into, prior to the amendment of 1895 to section 55 of the Civil Code, by him and her mother, by their mutual consent under a written contract, followed by their mutual assumption of marital rights, duties, and obligations, the evidence is held not to show such a mutual assumption of marital rights, duties, and obligations as was necessary to a valid marriage under that section, and that the trial court properly instructed the jury to that effect.

ID.—MARRIAGE AT COMMON LAW—LIVING TOGETHER AS HUSBAND AND WIFE—PRESUMPTION OF MARRIAGE.—At common law the ceremony of marriage was religious and to a valid marriage such ceremony was a prerequisite. But where a man and a woman lived together as husband and wife under the name of husband and wife, held

themselves out to the world as such, and by their conduct to each other and to the world thus established a common, uniform, and undivided repute that they were married, evidence of all this was accepted, not as establishing a marriage, but as raising a presumption that a marriage had taken place.

ID.—PRESUMPTION OF MARRIAGE UNDER CODE.—In this state, before the codes, the common-law rule obtained, and this principle of the common law was placed in the code and still remains there, in the declaration that it is a disputable presumption "that a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage." This presumption at common law, as under the code, was disputable, and whenever it conflicted with a higher presumption, as a presumption of innocence where a charge of bigamy was based upon a marriage resting in cohabitation and repute, it fell.

ID.—MARRIAGE UNDER SECTION 55 OF CIVIL CODE—LIVING TOGETHER AS HUSBAND AND WIFE WITH FULL REPUTE OF SUCH RELATION ESSENTIAL.—Under section 55 of the Civil Code, as it existed prior to its amendment in 1895, when it declared that to constitute a marriage consent first had must be followed by "the mutual assumption of marital rights, duties or obligations," it did not mean that less in the deportment, conduct, and repute of the parties was necessary than had been necessary at common law. All that the common law required was still necessary, and there could be no such assumption unless the parties lived together as husband and wife, treated each other in the way usual with married people, and so conducted themselves as to have full repute among their intimate friends and associates to be husband and wife.

ID.—CONSENT FOLLOWED BY COMMENCEMENT OF COHABITATION NOT SUFFICIENT TO ESTABLISH MARRIAGE.—To establish a marriage under that section, the consent of the parties, followed by a mere *commencement* of matrimonial cohabitation, or of the mutual assumption of marital rights, duties, or obligations, is not sufficient.

APPEAL from an order of the Superior Court of Los Angeles County refusing a partial distribution of the estate of a deceased person. James C. Rives, Judge.

The facts are stated in the opinion of the court.

Isidore B. Dockweiler, Hutton & Williams, Walter B. Grant, and Walter L. McCorkle, for Appellant.

Bradner W. Lee, Gavin McNab, Henry T. Gage, W. I. Foley, Gibson, Trask, Dunn & Crutcher, Garret W. McEnerney, Hull McClaughry, James L. Robison, and Walter Rothchild, for Respondents.

HENSHAW, J.—Elias J. Baldwin died, leaving a vast estate which is in process of administration in the probate court of the county of Los Angeles. Beatrice Anita Baldwin, otherwise known as Beatrice Anita Turnbull, appeared by her guardian (she at that time being a minor, though she has since attained her majority) and petitioned for partial distribution of the estate to her as a pretermitted child of deceased. (Civ. Code, sec. 1307.) A jury was empaneled to try the issues presented by this petition and the opposition thereto filed by the admitted heirs at law, and, after the taking of voluminous testimony, the trial judge withdrew the cause from the consideration of the jury and directed the jury to return a verdict for the contestants, stating the reason therefor to be that "as matter of law the evidence in this case falls far short of the requirements necessary to constitute a marriage."

The conditions under which the course pursued by the court in this instance is held to be proper are defined by a series of uniform decisions of this court, to which it will be sufficient to make reference. The doctrine of scintilla of evidence is rejected, as it is by the courts of the United States. (*Commissioners of Marion Co.* v. *Clark*, 94 U. S. 278, [24 L. Ed. 59].) A directed verdict is proper, unless there be substantial evidence tending to prove in favor of plaintiff all the controverted facts necessary to establish his case. In other words, a directed verdict is proper whenever, upon the whole evidence, the judge would be compelled to set a contrary verdict aside as unsupported by the evidence. To warrant a court in directing a verdict, it is not necessary that there should be an absence of conflict in the evidence, but, to deprive the court of the right to exercise this power, if there be a conflict, it must be a substantial one. To the support of these incontrovertible declarations of the law, we need do no more than cite *Lacey* v. *Porter*, 103 Cal. 597, [37 Pac. 635]; *Davis* v. *California St. R. R. Co.*, 105 Cal. 131, [38 Pac. 647]; *O'Connor* v. *Witherby*, 111 Cal. 523, [44 Pac. 227]; *Los Angeles etc. Co.* v. *Thompson*, 117 Cal. 594, [49 Pac. 714]; *White v. Warren*, 120 Cal. 322, [49 Pac. 129, 52 Pac. 723]; *Estate of Morey*, 147 Cal. 495, [82 Pac. 57]; *Estate of Chevallier*, 159 Cal. 161, [113 Pac. 130].

Appellant's position and contention are the following: Her

mother was married to Elias J. Baldwin; the marriage was
null in law, illegal and void, by reason of the fact that at the
time it was contracted or entered into Elias J. Baldwin was
the husband of a living wife to whom he had been joined by a
solemnized marriage (Civ. Code, sec. 61); as the issue of this
marriage null in law, she is the legitimate offspring of Elias
J. Baldwin under the rule of section 1387 of the Civil Code,
which declares that "the issue of all marriages null in law,
or dissolved by divorce, are legitimate"; she is a pretermitted
child of Baldwin, entitled to share in his estate, notwith-
standing the disposition of that estate made by his will. (Civ.
Code, sec. 1307.)    Essential to the consideration of the evi-
dence which must be had, is section 55 of the Civil Code, which
at the time of the asserted marriage between Elias J. Baldwin
and appellant's mother, Lillian A. Ashley, read as follows:
"Marriage is a personal relation arising out of a civil contract
to which the consent of parties capable of making it is
necessary.    Consent alone will not constitute marriage.    It
must be followed by a solemnization or by a mutual assump-
tion of marital rights, duties or obligations."    Admittedly,
the asserted marriage between Baldwin and the mother of this
appellant was not solemnized.    It is said to have been a mar-
riage entered into by mutual consent under a written contract,
which consent was followed by a mutual assumption of marital
rights, duties, and obligations.

At the threshhold, respondents deny the applicability of
this section to the admitted facts in the case.    They insist, and
challenge a contrary declaration, that there can be, and could
have been no marriage of any kind when one of the parties
to it was incapable of contracting, by virtue of the legal exist-
ing marriage; that in terms section 55 limits the application
of its language to "parties capable of making the civil con-
tract" of marriage, and that, under the conceded facts, no
marriage ever known to common or statute law could arise;
that when section 61 of the Civil Code declares that a subse-
quent marriage contracted under such circumstances is "ille-
gal and void from the beginning," the word "marriage" as
there used is but a loose though convenient way of expressing
the true meaning, which is that of a "subsequent *attempted*
marriage."    To this appellant makes answer that section 1387
of the Civil Code, in declaring that the issue of all marriages

null in law are legitimate, is designed to meet precisely such a case as the one at bar, and so to relieve the laws of this state from the workings of the unjust rule which would visit the sins of the parents upon the innocent children. And it is said that this view finds support in *Graham* v. *Bennett*, 2 Cal. 503; *Sharon* v. *Sharon*, 75 Cal. 25, 26, [16 Pac. 345]; *Blythe* v. *Ayres*, 96 Cal. 582, [19 L. R. A. 40, 31 Pac. 915]; *Estate of Gird*, 157 Cal. 540, [137 Am. St. Rep. 131, 108 Pac. 499]. These considerations, however, may be passed over without determination, and the case considered from the point of view most favorable to appellant; that is to say, the point of view which would hold the provisions of section 1387 of the Civil Code to be applicable to the conditions here admittedly existing. This may be done, we say, without impairment of the rights of any of the litigating parties, because, if there was no marriage in fact between E. J. Baldwin and Lillian A. Ashley, the determination that section 1387 of the Civil Code is applicable to such a marriage as is here asserted, would neither injure nor benefit appellant or respondents.

We are still further influenced to refrain from this consideration by reason of the fact that to stop what was becoming a public scandal and a reproach to the state, the legislature, seventeen years ago, amended section 55 to read: "Consent alone will not constitute a marriage; it must be followed by a solemnization authorized by this code."

Wherefore, we indulge the not unreasonable hope that this case will prove the last of a most malodorous brood.

And thus we are brought to a consideration of the evidence. This consideration will be had with due regard to the rules of law governing conflicts in evidence and to the rights of the appellant to receive every reasonable inference which can be drawn from substantial evidence in her favor. But it will also be had with due recognition of the fact that evidence to be substantial must be humanly credible.

From the nature of the case, the evidence on behalf of appellant could not be and was not her own. Substantially all of the evidence was that of her mother. That evidence, as the attorneys for appellant view it, establishes the following, which this court is told it is "bound to take as true": Lillian A. Ashley (now by marriage Lillian A. Turnbull) is the mother of appellant. She was born in 1868 in Vermont.

Her father owned a small stock farm. He died when she was about fifteen years old. She continued to live on the farm with her mother for a few years. She was at all times interested in race horses, and her father received newspapers and magazines devoted to turf matters. She went to Boston to be treated for an injury to her spine, leaving her mother still upon the farm. Her mother died in 1890, the daughter being at that time still in Boston. She was educated and had taught school in Vermont, and was keenly desirous of further education. She was of Puritanical training and temperament. She began an innocent correspondence with the noted millionaire and breeder of race horses, Elias J. Baldwin, in an effort to secure a memento from him of one or another of his famous animals. While in Boston she was for a time supported, wholly, or in part, by a Mr. Balch, a married man and a friend of her deceased father, who paid over to her moneys which he owed for horses which he had purchased from either her father or mother. Mr. Balch's death cut short this source of income, and she became dependent for her living upon her own exertions. She entered the family of a Mr. and Mrs. Thompson, people of refinement, living at Winchester, near Boston, who had lost their only child, a daughter, by death, and who took her in as a companion. As a result of the innocent, though desultory, correspondence which she had conducted with Baldwin, whom she had never seen, Baldwin called at the Thompson's in 1891, was received by Mrs. Thompson and Miss Ashley, and spent a few hours in conversation with them. He invited them both to come to California and visit him, without expense to them, at one or another of his hotels. Miss Ashley was then about twenty-three years of age, but was ardently desirous of pursuing her studies and acquiring a higher education. Her ambition was to enter Wellesley College. All this was discussed in the conversation at the Thompson home, and Mr. Baldwin spoke of his willingness to aid her in procuring an education, and, indeed, of his willingness to adopt her as his daughter. Baldwin went away and Miss Ashley continued to write to him often, without receiving letters in response. She spoke in these letters of his "promise to educate her" and of his "promise to adopt her." These letters are the outpourings of an innocent girl's mind. She had been her father's pet, and she desired in the same

way, but only in the same way, to become the petted child of Baldwin. No pure minded person can read these letters which are in evidence and find in them any *indica* of immorality or improper motives.

She came to California with a Raymond excursion party and reached Los Angeles. This was on February 20, 1893. She had previously written to Baldwin that she was coming, asking him to meet her at Colton. He did not meet her, but subsequently, while she was in Los Angeles, sent her twenty-five dollars to make the trip to San Francisco where he was. She arrived in San Francisco upon the evening of March 2d. She was met by Baldwin, and by him conducted to his hotel where she was registered by him as "Mrs. Ashton, Boston." She was assigned to rooms above the suite of apartments occupied by Baldwin himself. Baldwin showed her about the hotel and returned with her to her rooms. There they talked about sundry matters, but, in particular, about Baldwin's desire that she should permit him to adopt her, and that she should remain in California as his daughter. She knew, or at least believed, that Baldwin was a married man, and knew, or at least believed, that he was the father of grown daughters. Notwithstanding that her letters to Baldwin were filled with expressions of her desire that he should adopt her, she declined his proposal, giving as a reason that she had a beautiful home in the east, and her intention was to return to it to finish her education. (She was at that time over twenty-four years of age, and had no home in the east, beautiful or otherwise, as she had ceased sometime previously to be a member of the Thompson household and had been living at a hotel.) Baldwin kissed her affectionately that evening upon parting. They spent a part of the next day, March 3d, in driving about the city. Baldwin dined with her that evening in her room, after which they went together to the theater. After the theater they went to Baldwin's suite of rooms—rooms where Baldwin told her that he lived and made his home. They had champagne at supper, of which they drank moderately. Baldwin was affectionate and kissed her. She having refused to become his adopted daughter, Baldwin asked her finally how she would like to marry an old fellow like him. (He was then sixty-five years old.) He told her that he was all alone in the world. She had believed up to that moment that

he was a married man, and so declared, saying to him, "Why, Mr. Baldwin, I supposed you were married." He informed her that he was legally divorced and had no one to love him or care for him. He urged an immediate marriage. She demurred. She insisted upon a marriage before a minister or a judicial officer. He "argued" that a "marriage paper" made out and signed by the two of them would be equally binding and just as good. So they "were married there in that way." Baldwin took some hotel stationery, dated it March 3, 1893, and wrote on it: " 'I, Elias Jackson Baldwin, do take Lillian Alma Ashley to be my lawful wedded wife,' and he signed it. And he wrote, 'I, Lillian Alma Ashley, do take Elias Jackson Baldwin to be my lawful wedded husband' and he told me to sign it and I signed it. . . . Then he folded the paper and gave it to me and he said that was just as good a marriage certificate as any minister could give me, and that I was his wife." Miss Ashley had come to San Francisco with a suit case. This suit case, which had contained her personal effects, was in her room on the floor above. For this reason the bridal night was spent there, Baldwin going to her rooms, carrying his nightrobe. Here the narrative pauses, while we turn to the consideration of the evidence offered by respondents.

Again we repeat that this presentation is in full recognition of the rule governing conflicts of evidence. It is not its purpose to weigh the conflict where such conflict exists. It is proper, however, to say, that in some instances the testimony of Mrs. Turnbull must be rejected as incredible. In all instances it is necessary that the evidence be presented to throw light upon the second chapter to which we will shortly come, the chapter that deals with the asserted marriage relations of these two people; for we are called upon to consider a marriage claimed by appellant to have been effectuated without solemnization, but by a consent, followed by the mutual assumption of marital rights, duties, and obligations. The existence of this marriage is denied, the assumption of the marital rights, duties, and obligations is likewise denied. Wherefore, the characters of the two parties to the asserted marriage becomes an important consideration in determining the real nature of the relationship which existed between them. For, while, as has been said, it is contended upon

the part of appellant that the evidence establishes that Lillian A. Ashley was a pure, innocent, confiding girl, who yielded to the embraces of Baldwin solely in the belief that she was legally his wife, the contention of respondents in this regard is that she was a designing and mercenary wanton, who had been the mistress of other men, one of whom, at least, she had blackmailed, and that she voluntarily entered into a fugitive and meretricious relationship with Baldwin thinking nothing of matrimony, but solely of money.

Taking up the life of Miss Ashley in 1889, respondents introduced evidence to show, and contend that they have overwhelmingly shown, the following facts: Miss Ashley lived in Boston in 1889 as the mistress of Wesley P. Balch, a horseman. He died by suicide in November, 1890. Being thus thrown upon her resources she renewed her letter writing to Baldwin, which she had allowed to flag or lapse. Thus, in March, 1891, she writes to Baldwin: "But when he (Balch) died, and by his own dear hand too, I shall never forget the deep sorrow it has cast over my life. Left alone in a great city, homeless and friendless, no money, no income now. . . . I have led such a carefree dependent loving life, that to find myself dependent upon my own resources and alone, it nearly kills me. . . . It is impossible for me to exist very long unless I have someone to love and who in turn cares very tenderly for me. . . . But somehow I feel that I wish we might mutually agree and you could love and care for me as he did (but he held my property). You would be obliged to care for me with your own property or means, for I have none now. However, I would always be an obedient girl. I should mind you and love you so truly if you would adopt me in this manner as he did. . . . Will you adopt me in this way and care for me with your own money, pay all my bills and love me very fondly in a nice manner? If so, I know I shall be very fond of such a benefactor." In 1889 she wrote a letter, hereinafter quoted, to Lewis Leach of the Fair Grounds Association at Fresno, California, a man whom also she had never met—a respectable elderly man of about sixty-five years of age. She admits having written this letter and similar letters to other horsemen throughout the United States, whose acquaintance even she had never made. She wrote a similar letter to Baldwin.

"28 Union Park,
BOSTON, MASS. July 10, (1889)

MR. LEWIS LEACH,

My dear Sir.

I was born and raised in Vermont, love horses almost to destraction, am 20 years old, will be 21 the 11th of next Nov. am alone in the World, my own mistress and have got to earn my living as am not rich by any means. Saw your name in the *Horseman* in connection with the great International Running Race, as I want to have a horse loving friend in Cal. to secure me a nice position, also further my interests in various ways so that I can go there in the near future, I have written to *you*, My Eastern 'Prince' is Wesley P. Balch, but as I am going to Cal. to live for a while, shall need a 'Count' on the Pacific coast. Now if you are a whole souled Youth with the 'Ducats' good figure, and fair looking face, write me & enclose Photo, and on receipt of same, will tell you more about

Yours truly,

MISS L. A. ASHLEY—

or 'The Blonde.' "

To Baldwin, after the death of Balch, she wrote numerous letters, from which the following are extracts: "You see I really have not lived in Boston since Mr. Balch died, am 16 miles out with a Widow lady & her dog. We don't agree very well, and I hate to be dependent upon her, & I wish I could go back in Town and take my pretty apartments in 9 Rutland Sq. again, and because I cannot go, (for I have not the ducats), I am unhappy. For I had an income from my property when Mr. B. was alive. I want to tell you all my 'woes' and perhaps you might make me very happy. I guess I should hug you if you was here, and did make me happy. But as long as you are not I can say so, eh. Please write on receipt of this. . . . You said in one of your letters that would try to be my friend and see that I do not want for anything. Please then let me go back to my pretty rooms and girlish carefree life again, for I am so weary of this place. Will you? I will send you a nice letter every week and then when you do come east next summer, you will find a happy Girl to greet you in Boston, Mass. Will you adopt me this way, and care for me with your own money, pay all my bills and Love me very fondly in a nice manner, if so

I know I shall be very fond of such a Benefactor. . . . However, by your letters I really believe you to be a Gentleman of Honor, and so nice that I can't help caring for you. The most stubborn wills can be won by love. . . . I have thought that if I were to go back to Town to my Rooms it might not be wise unless I could find some way of accounting for my means of Support for People know I lost my Property by Mr. Balch's death, at least they know it in Rutland Sq. I might find rooms in some other nice Christian family or Perhaps board to some Hotel, or else say I had unearthed a rich Uncle in California, who was going to adopt me when He came East this commin Summer. I will leave you to suggest, and I will always obey you. . . . I have not been myself at all, because am cared for as a little child, not capable of taking care of myself, and no wonder I drank Chloral last April and tried to drown myself. You would do the same or more, if you were only a girl surrounded by a lot of old 'gone by' Society Ladies, who were lecturing you to death by their tongues if they ever saw a Gentleman speak to you, now a spirited girl like I, objects to being always kept down in this way and never have a Gentleman friend, so this time I just run away, and my sole object was to run right to your arms and ask peace and Protection. But my money gave out, and I could not go on without the Ducats, so have waited for you so patiently as my only Hope from being taken back to Boston. . . . Oh if only you could telegraph me the money to come to you. I would be in San Francisco as fast as steam could fetch me. . . . I ran away from Boston Aug. 5th to Hornellsville, N. Y., left there two days later for Richmond, Va., stopped over Sunday in Harrisburg,, Pa., staid at the Commonwealth Hotel, told Mr. Russ, the Prop'r that had run away from home, and was going to Richmond, Va., that my funds had given out, etc., but would like to stop over Sunday as I do not believe in travelling on the Sabbath if one can possibly avoid it. I suppose my laughing girlish way won him over, and he asked me if I was running away to meet my Lover to get married. I only laughed, and thought my, if he only knew how the old ladies that support me keep me from having one single lover, he would not be guilty of asking such a question as that. When I came away I done a very naughty thing I realize now, for I told him if I did not

CLXII Cal.—16

send him the money, $4.50 in three weeks, to charge my Expenses to you. Now am I not a fraud? But my dear old Pet, you see I thought I should have a chance to get to 'Frisco' before then, and with a 'Hug and Kiss' fix it all right with you. But such is life so do not blame me too hard, will you? I enclose the bill to you now. Please write me soon and direct to my own name, No. 9 Rutland Sq., Boston. Send me the ticket or money and I will surely come to you. Lovingly Yours, Lillian A. Ashley." All this and much more was before she had ever seen Baldwin. Subsequent to his visit at the home of the Thompsons she wrote as follows: "Hope all your business will go to suit you, and you wont forget me and my Wants again. I shall think of you all the time now and dream of you too I am afraid. I am going in Town to meet a young lady and go shopping in the morning, and Mr. and Mrs. T. will go up to the mountains for three days. Now don't you wish you had stayed. Write soon. With a Hug and Kiss, Lillie. Please write something of your former intentions of adopting me if I pleased you and your wife, etc., make it read nice and write me all the impressions you had of 'Yours truly.' Lovingly Yours, L. A. A."

There are many more similar outpourings of this Puritanically innocent mind, but these will suffice as exemplars, and we turn to another of her life phases. In May, 1892, she met Colonel Pope, and as a result of this meeting, or of this and subsequent meetings, she received from him through his attorney, who was a witness in the case, large sums of money. Her explanation is that Pope lured her to a bed room under pretense of taking her to a respectable private lunch room, and attempted a rape upon her; that he failed utterly in his wicked design and deeply repented of it; that he was a very philanthropic man, and, actuated by the combined motives of philanthropy and remorse, he forced money from time to time upon her—money which she was reluctant to receive, and which at times she refused to receive. Upon the other hand, her own letters, over the authenticity of which there cannot be the slightest doubt, disclose and declare with nauseating circumstantiality of detail, that she was the mistress of Pope, had willingly submitted to his embraces, and thereafter had instituted a system of blackmail, so that Pope called to his aid his attorney, who, with a detective, effected an

arrangement with Miss Ashley, whereby she was to be paid two hundred dollars per month if she would not annoy Pope by writing to him (Pope being a married man with a family of children) and would keep away from Boston. In receipt of an income from this source, she left the Thompson home and established herself in a hotel in Boston, explaining to the Thompsons that a millionaire "up the Hudson" had become enamored of her and engaged to her and was giving her money on condition that she travel. It is to W. A. Redding, the attorney for Pope, that she expressed her desire to go to California, and it was he that gladly gave her the money. She is thus living upon the fruits of Pope's unsolicited bounty, or upon the blackmail which she wrung from him, when she entered into her marriage contract with Baldwin. And here we may anticipate the future narrative to make a statement which will, of course, occasion not the slightest surprise. The written contract was never produced. The explanation of its non-production, however, *is* surprising. Baldwin, as we have seen, gave it to her, but a day or two after asked her to give it to him, which she did, he saying that "girls were so careless about such things," and, of course, she never saw it thereafter. And, to finish this outline, it should be said that Baldwin was sixty-five years of age, with daughters grown-up and married, and one of them a grandmother, with his home in San Francisco, where lived his wife, married by a church ceremony, and known to the world to be his wife. Baldwin's own reputation as a libertine, if not national, was certainly more than local, and there is evidence that Miss Ashley knew this, though as Mrs. Turnbull she unhesitatingly denies this fact, as it may be said, she denies nearly every other fact or circumstance which may be thought to weigh against her.

The story of the assumption of marital rights, duties, and obligations following the marriage contract entered into at midnight of March 3d next follows. The two slept in the rooms assigned to Miss Ashley as "Mrs. Ashton," not even in the apartments of Baldwin which he had declared to be his "home"; had breakfast in the woman's room next morning and later in the day went to a gallery where she was photographed. That night he again slept with her in her room and on the 5th, 6th, or 7th of March, the bride being unable to name the date with more particularity, he left her and

went to Bakersfield alone. During this period but one person is declared to have seen them together in her room, and that person an unknown negro waiter who served their breakfast. She was still registered as "Mrs. Ashton." Her explanation of this is that the secrecy was maintained at Baldwin's request. On March 8th she went alone to Los Angeles and herself registered at the Westminster Hotel as "Miss L. A. Ashley, Boston, Mass." Two days later Baldwin joined her at the hotel. They lunched together in the public dining room and took a train for San Diego. They arrived at San Diego on March 10th and Baldwin, there, did the registering. The registration was "E. J. Baldwin and Daut." They were assigned adjoining rooms, whether connecting or not she did not remember, but they slept together at night. Three days were spent in driving about the city. The only person whom she recalls having met at the hotel was Mr. Babcock, the proprietor. She says that Mr. Baldwin introduced Mr. Babcock to her as Mrs. Baldwin, notwithstanding the fact that the register showed them as father and daughter. And once more, anticipating for a moment, it may be said that Mr. Babcock testifies that he was introduced to her by Baldwin as his daughter and that in a seduction suit which Miss Ashley subsequently brought against Baldwin she caused the deposition of Mr. Babcock to be taken, and it was taken, for the express purpose of showing that Baldwin had so introduced her as his daughter, and that the register showed this precise fact. Leaving San Diego upon March 12th and traveling together to Los Angeles, Baldwin left her at the depot and told her to proceed to the Oakwood Hotel at Santa Anita and there register as Miss Ashley. The Oakwood Hotel was owned by Baldwin, was near one of his home places, the great Santa Anita Ranch, where lived one of his married daughters, Clara Stocker with her husband. Miss Ashley went to the hotel and so registered. The next day she was one of a "bus party," which was driven from the hotel to the grounds and private residence of Mr. Baldwin a mile away. She there saw Mr. Baldwin and went driving with him. During all of the time that she remained at the Oakwood Hotel, which was from March 13th until April 19th, Baldwin, admittedly, in the daytime was domiciled at his home upon the ranch. He was never registered at the Oakwood Hotel, where in a single

room and registered as 'Miss L. A. Ashley" was his trusting, confiding and Puritanical wife. She asserts in contrariety to the testimony of every other witness that Baldwin came to the Oakwood Hotel at night and slept with her. She does not assert that any human being knew this, even her brother, who occupied an adjoining room. Every other witness at the trial with any knowledge of the facts, including the then lessee and manager of the hotel, swore that Baldwin never in his life spent a night in a room at the hotel. Be this as it may, and accepting Mrs. Turnbull's statement that he did so spend the nights with her there, indisputably the visits were furtive and clandestine. Upon April 19th, Baldwin having departed some days prior thereto, Miss Ashley left the Oakwood Hotel and with her brother went to San Francisco and to the Baldwin Hotel. Here again she registered as Miss L. A. Ashley, or Lillian A. Ashley. She testifies that she occupied Baldwin's suite at the hotel. The evidence of the manager is that the hotel books showed an assignment to her of a room upon another floor. However this may be, she names but two persons who ever saw her in those rooms, an unnamed and undiscoverable negro servant, and George Baldwin, son-in-law of E. J. Baldwin and husband of his daughter Anita. She and Baldwin breakfasted and dined, she says, in his rooms, while she took her luncheon in the main dining room at a table where sat her brother, Anita, Baldwin's daughter, George Baldwin, her husband, Henry E. Highton, Baldwin's attorney, and Mrs. Highton, his wife. With the single exception of George Baldwin, who admittedly was fully aware that Baldwin had a wife living in a home upon California street in San Francisco, Mrs. Turnbull does not assert that during her entire stay at the hotel any one of these persons with whom she sat at the table ever knew her other than as Lillian Ashley. She thus, and under these conditions of life, remained in the hotel from April 20th until about May 17th. A few days before the last named date she says she overheard the name of "Mrs. Baldwin" mentioned by Anita and later by another woman. She asked Baldwin about it and he told her he was married and not divorced. She at once broke off all relations with him and became ill. Upon May 17th Baldwin left for the east. Immediately thereafter she was told to vacate her rooms. She did so upon the 26th of May, 1893, and went

east in pursuit of Baldwin. She found him upon the St. Louis race track and obtained from him forty dollars. With this she went to Boston to see Colonel Pope. She was turned over to James R. Wood, a detective in his employ. He arranged with her that if she would go back to California and live there for a year without annoying Pope he would within a year buy her a home in Los Angeles for two thousand dollars in return for a full release to Pope from all her claims and demands. She gave the release and received the home. She was with child, which was born December 27, 1893, and the paternity of this child was charged upon Baldwin. Subsequently she brought a suit for seduction against him in which a vast amount of documentary evidence, consisting of her letters to Baldwin and Wood and W. A. Redding, Pope's attorney, and to others were introduced. She failed in this action. The judge who tried that case, and the court room clerk, testified to the genuineness of these letters and to their having been introduced in evidence without demur or question of their genuineness upon her part, though at the present trial whenever such a document appears to be damaging she unhesitatingly pronounces it a forgery. Many of these letters, of course, bear the file marks of the court upon the former trial.

To fill in this outline which has been given of her testimony as to the assumption of marital rights, duties, and obligations, nothing need be added to the period from the 3rd of March to the 12th of March, when she reached the Oakwood Hotel. The general course of life of herself and Baldwin there has been described according to her own testimony. The only persons whom she named as having any knowledge of the asserted marital relations while she was at the Oakwood Hotel were her brother, whose deposition taken in the seduction case, which deposition in this case he declares to be the truth, entirely negatives her assertion; a Mr. Risner, who is dead, a Mr. Stevens, who is dead, and Mr. and Mrs. Fox, tourists from "somewhere in Wisconsin," who could not be located, a Mr. Lopez, who denied that he had ever been introduced to her at all, or that he had even known her as Mrs. Baldwin, two women, neither friends nor associates of Baldwin, and finally Mrs. Stocker, Baldwin's married daughter. herself a grandmother. Upon the trial of this action Mrs. Turnbull's testimony was given at intervals and consumed much time in the

taking.  Asked concerning her meeting with Mrs. Stocker at
the Oakwood Hotel and whether Mrs. Stocker spoke to her
"as she would to a mother," Mrs. Turnbull replied that she
did not, adding, "I think she very likely thought I was Miss
Ashley."  Mrs. Stocker, of course, knew of the existence of
the legally and ceremoniously wedded Mrs. Baldwin, but a few
days later Mrs. Turnbull testified that Baldwin had, in fact,
introduced her to Mrs. Stocker as his wife, and that at a din-
ner party given in her honor, Mrs. Stocker leaned over and
whispered to her "Mother."  Mrs. Stocker denies all this ab-
solutely.  This covers the matrimonial relationship at the Oak-
wood Hotel.  At the Baldwin Hotel during the time of her
last residence there, George Baldwin, a cousin of E. J. Bald-
win, and husband of his daughter, who knew the true Mrs.
Baldwin intimately and had lived at her home for months,
testified that Baldwin introduced Miss Ashley to him as his
wife.  He says: "He (E. J. Baldwin) asked me to say noth-
ing in regard to the introduction he gave me.  I says, 'How
is that, haven't you got a wife?'  And he says, 'Yes, but you
can have as many as you want if you know how to manage
it.'  I says, 'That is a new one on me; you can do that in
Utah, but not in California.'  He says, 'Don't say anything
about it, George,' and walked away."  Another witness, Stew-
art by name, said that he had met her with Baldwin in the
corridor of the hotel and Baldwin had introduced her as his
wife.  He was not sufficiently well acquainted with Baldwin
to know at that time that Baldwin had a legal wife.  Some
other witnesses of similar character offered like testimony.
The explanation lies, perhaps, in the evidence given by one
of them, Wheatfield, who said he thought that Mrs. Turnbull
was one of the women Baldwin had introduced to him as his
wife.  Wheatfield declared that Baldwin had introduced so
many women to him as his wife that he had "got himself mixed
up so on Mr. Baldwin's ladies that I would not stand here on
oath and swear to any of them. . . . as to being his wife or
not his wife. . . . He had a manner of introducing them that
way."

During the period of time of this asserted matrimonial re-
lationship she was in receipt of and receipted for moneys from
Colonel Pope in the name of Lillian Ashley.  During this
time she wrote for and received four hundred dollars from

Pope to make a trip to Australia, for it appears that Pope was quite willing to pay the larger price for the greater distance. It is uncontroverted that wherever and whenever she was called upon to write her name she wrote it Lillian Ashley. In the seduction suit which she subsequently brought against Baldwin and wherein she charged him with "soliciting and importuning her to have sexual intercourse with him, and, by means of artifice and promises, inducing her so to do," from the beginning to the end, in all of the explanations, examinations, and cross-examinations touching the false promises which led to the seduction, there is not one word of this asserted marriage. Moreover, in the letters which she wrote to Wood, Pope's detective, at a time when she thought that Wood would aid her in her prospective seduction suit against Baldwin, letters of a most extraordinarily intimate character, letters urging that Pope deny his intimacy with her, and that she would do the same, for fear of the injurious effect which the truth would have upon her case against Baldwin, nowhere is there the slightest intimation, much less claim, of a marriage contract or a marriage relationship.

The law governing the consideration of evidence offered to support a marriage such as is here contended for, merits presentation. But from the very simplicity and uniformity of that law, the presentation may be brief. At common law the ceremony of marriage was religious and to a valid marriage such ceremony was a prerequisite. But where a man and a women lived together as husband and wife under the name of husband and wife, held themselves out to the world as husband and wife, and by their conduct to each other and to the world thus established a common, uniform, and undivided repute that they were married, evidence of all this was accepted, not as establishing a marriage, but as raising a presumption that a marriage had taken place. The law was influenced to this end because it always inclines to believe in fair dealing rather than foul, it presumes innocence and not guilt, it prefers to recognize a relationship held out to the world as honest to be honest rather than dishonest, and it leans to the legitimacy of children. In this state before the codes the common law rule obtained, and this principle of the common law was placed in the code and still remains there, in the declaration that it is a disputable presumption "that a man and woman

deporting themselves as husband and wife have entered into a lawful contract of marriage." (Code Civ. Proc., sec. 1963, subd. 30.) This presumption at common law, as under the code, was disputable, and whenever it conflicted with a higher presumption, as the presumption of innocence where a charge of bigamy was based upon a marriage resting in cohabitation and repute, it fell. (*Case* v. *Case,* 17 Cal. 598; *White* v. *White,* 82 Cal. 427, [7 L. R. A. 799, 23 Pac. 276] ; *People* v. *Beevers,* 99 Cal. 286, [33 Pac. 844].) We need not be at length to point out the requisites of conduct, deportment, demeanor, and repute necessary at the common law to supply evidence from which the presumption of marriage could arise. The subject is elaborately discussed in *White* v. *White,* 82 Cal. 427, [7 L. R. A. 799, 23 Pac. 276], and the common law authorities cited. The opinion of Lord Westbury in *Campbell* v. *Campbell,* L. R. 1 Sc. & Div. App. 200, 211, is quoted to the following effect: "Cohabitation as husband and wife is a manifestation of the parties having consented to contract such relation *inter se.* It is holding forth to the world by the manner of daily life, by conduct, demeanor and habit, that the man and woman who live together have agreed to take each other in marriage and to stand in the mutual relation of husband and wife; and when credit is given by those among whom they live, by their relatives, neighbors and acquaintances, to these representations, and their continued conduct, then habit and repute arise and attend upon the cohabitation. The parties are holden and reputed to be husband and wife; and the law of Scotland accepts this combination of circumstances as evidence that consent to marry has been lawfully interchanged. Probably, therefore, in the correct expression of the law, it would be more proper to say that cohabitation with habit and repute is a mode of proving the fact of marriage—rather than a mode of contracting marriage." And this court declares it to be "well settled that the repute which, with cohabitation, will be proof of marriage, must be uniform and general, not divided and singular. If repute lacks uniformity and is divided, then such repute cannot prove a marriage." In the later case of *Quackenbush* v. *Swortfiguer,* 136 Cal. 149, [68 Pac. 590], it is repeated: "It may be said that the law is elementary that the repute which, with cohabitation, will be proof of marriage, must be uniform and

general, and not divided and singular, and cannot be estab-
lished, except by the open, undisguised, and undoubted acts
of the parties which are visible to outsiders." So much for
the governing principles of the common law. The code sec-
tion did not modify the requirements of the common law.
When it declared that to constitute a marriage ·consent first
had must be followed by "the mutual assumption of marital
rights, duties or obligations" it did not mean that less in the
deportment, conduct and repute of the parties was necessary
than had been necessary at common law. All that the com-
mon law required was still necessary. The subject is reviewed
in *Sharon* v. *Sharon,* 79 Cal. 633, [22 Pac. 26, 131], and,
while holding to the requirements of the common law às here
set forth, it is added: "But certainly, if consent and consum-
mation by sexual intercourse were sufficient to constitute mar-
riage at common law, it clearly appears to have been the in-
tention of our legislature to change ·that rule and require
something more. At common law, and under statutes author-
izing marriage by consent, without formal ceremony, if the
parties agree presently to take each other for husband and
wife, and from that time live together *professedly in that re-
lation,* proof of these facts is held to be sufficient to constitute
marriage. Certainly nothing less than this can be held to be
sufficient under the latter clause of section 55. There must
be evidence sufficient to show that they *assumed* the relations
of husband and wife, which calls for the same degree of proof,
if cohabitation be depended upon, as was required at common
law to establish the marriage." In *Hinckley* v. *Ayres,* 105
Cal. 357, [38 Pac. 735], the matter is thus succinctly summed
up: "There is no need here of discussing the law of marriage
without solemnization. or the question, What constitutes a
'mutual assumption of marital rights, duties or obligations?'
within the meaning of section 55 of the Civil Code. The law
on that subject is sufficiently settled for the purposes of the
case at bar in *Sharon* v. *Sharon,* 79 Cal. 633, [22 Pac. 26,
131]; *White* v. *White,* 82 Cal. 427, [7 L. R. A. 799, 23 Pac.
276]; *Kilburn* v. *Kilburn,* 89 Cal. 46, [23 Am. St. Rep. 447,
26 Pac. 636]; *People* v. *Beevers,* 99 Cal. 286, [33 Pac. 844],
and other cases. There is no such assumption unless the
parties live together as husband and wife, treat each other
'in the usual way with married people,' and so conduct them-

selves as to have full repute among their intimate friends and associates to be husband and wife." And to the like effect may be cited *In re Briswalter,* 72 Cal. 107, [13 Pac. 164]; *Harron* v. *Harron,* 128 Cal. 308, [60 Pac. 932]; *In re Jessup,* 81 Cal. 408, [6 L. R. A. 594, 21 Pac. 976, 22 Pac. 742].

When to what has been disclosed as the conduct and life of these parties in the brief months during which the marriage relationship must, if it existed, be established by this open and undivided repute, it is remembered that Baldwin's lawful wife was living in San Francisco, that in his wide circle of intimate friends and associates no one was presented to this supposititious wife, that she herself never represented or claimed herself to be his wife, that for him to have done so would have been to declare himself guilty of the crime of bigamy, and that in the communities where their fugacious and furtive intrigue was carried on it could not have been possible for the repute of their marriage even to have existed, much less to have become uniform, general, and undivided, because the very persons who alone could have established such repute knew of the existence of Baldwin's legal wife, and would have known that the pretensions of another were ill-founded, (and repute to be repute must be believed,)—can it be said that any review of this evidence is either needful or desirable? To declare that the holy state of matrimony is shown by this low, lecherous liason, this clandestine commerce, compounded of concupiscense and cupidity, would be to the mind of woman as abhorrent as to the mind of man it is preposterous, and we express our accord with the declaration in the brief of attorneys for respondents, that "to deny the trial court the right to direct a verdict in such a case and upon the facts here proved would be to deny it the right to retain its self-respect."

Lest it may be thought to have been overlooked through inadvertence, one other contention of appellant deserves brief consideration. It is, in effect, that the law requires only a *commencement* of matrimonial cohabitation, of the mutual assumption of marital rights, duties, or obligations, and that once the commencement has been made the marriage is complete; that this commencement need not be public, nor need the matrimonial cohabitation continue. This is but a euphemistic way of declaring that if a man and woman, however

secretly, consent to take each other as husband and wife, and follow that consent by a single secret act of sexual intercourse, the marriage is complete. The same argument was advanced in *Sharon* v. *Sharon,* and was met and answered in the following language: "The contention of the respondent is thus expressed in her brief: 'We repeat, the first mutual act, be it of sexual commerce or the assumption of any other right, duty or obligation, of the marital relation, after the execution of the written contract of marriage, instantly establishes the relation of husband and wife.' The exigencies of her case drive her to this position. If it cannot be upheld, the conclusion reached by the court below must inevitably be wrong. Let us see to what this would lead us. It means, supposing a case, that where a couple are associated together in the meretricious relation of man and mistress, and in the habit of meeting occasionally, solely for the purpose of gratifying their passions, while so connected they *consent,* no matter how informally, to marry, and thereafter continue to live precisely as before, the mere fact that sexual intercourse, under such circumstances, follows after the consent amounts to a mutual assumption of marital rights, duties and obligations, and from that time they are husband and wife. It means, therefore, that, in some cases at least, this requirement of the statute amounts to nothing. It means that a couple may consent to marry, may live precisely as if they are unmarried and their relations meretricious; to the world they may appear to be unmarried, and their children, if they have any, appear to be bastards; if they conclude to violate their 'consent' to marriage, they may go their ways; that they were husband and wife cannot be proved, and their children are bastards indeed. *We cannot so far reflect upon the law-making power as to hold that such was their intention."*

The decree appealed from is affirmed.

Angellotti, J., Shaw, J., Lorigan, J., Melvin, J., and Beatty, C. J., concurred.

Rehearing denied.