[Civ. No. 3143.   Third Appellate District.—April 22, 1927.]

W. J. McCARTHY, Respondent, v. PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation), Defendant; A. B. WATSON, etc., Appellant.

[1] Negligence—Collision Between Auto-bus and Electric Train at Railroad Crossing — Personal Injuries to Passenger — Speed — Care.—In this action for damages for personal injuries sustained by a passenger on an auto-bus resulting from a collision between said bus and an electric railway train at a railroad crossing, the motorman operating the railway car had the right to presume that the auto-bus driver would use due care in approaching the crossing and was not bound to check the otherwise rightful speed of his car in passing such crossing until he had reason to believe that the bus driver was neglecting to use care.

[2] Verdict — Consequences Following Directed Verdict — New Trial. — The consequences which follow from a directed verdict and from a new trial are so different that the rule applicable in the two instances is not the same.

[3] Id.—When Court Should Grant Nonsuit—Evidence.—The court may grant a nonsuit only when, disregarding conflicting evidence

---

3. Compulsory nonsuit, when should be granted, note, 24 Am. Dec. 620. See, also, 9 Cal. Jur. 557.

and giving plaintiff's evidence all the value to which it is legally entitled, the result is that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict was given.

[4] Id. — Rule as to Directed Verdict — Nonsuit — Inferences.—In determining the correctness of the court's action in directing a verdict, the rule in respect to nonsuits should be adopted and all conflicts with testimony on behalf of plaintiff disregarded, and every reasonable inference that may be drawn from such testimony should be resolved in plaintiff's favor.

[5] Negligence — Approach of Electric Train — Warning by Motorman — Conflicting Evidence — Question for Jury.—In such action, it was for the jury and not the trial court to pass on the conflict in the testimony as to whether the motorman seasonably attempted to warn the driver of the bus, and as to whether he could have stopped the car and avoided the collision with the bus.

[6] Id.—View of Approaching Train — Presumptions — Evidence.— In such action, where the evidence of passengers on the bus showed that the railway car could easily have been seen and the bus driver did not testify, it will be presumed that the driver saw the railway car approaching the crossing.

[7] Id.—Speed at Crossing — Presumptions.—In such a case it was the duty of the driver of the bus to presume that the motorman of the railway car in reasonable probability would continue up to and over the crossing without slowing down.

[8] Id. — Duty of Auto-Bus Driver — Protection of Passengers.— In such action, the continuing duty rested upon the driver of the bus to use reasonable caution in protecting his passengers from the collision.

[9] Id.—Failure of Auto-bus Driver to Exercise Care — Evidence — Directed Verdict.—In such action, the evidence was sufficient to justify the trial court in directing a verdict against the owner of the bus, where it showed. conclusively that the driver, with an apparent willingness to take a chance, left a place of safety where he could see, as others saw, the approaching railway car a few seconds before the collision.

(1) 33 Cyc., p. 979, n. 74.    (2) 38 Cyc., p. 1565, n. 76.    (3) 38 Cyc., p. 1559, n. 35, p. 1577, n. 36.    (4) 4 C. J., p. 765, n. 88.    (5) 33 Cyc., p. 1110, n. 64.    (6) 22 C. J., p. 104, n. 88, p. 111, n. 54; 33 Cyc., p. 1073, n. 16.    (7) 10 C. J., p. 968, n. 34.    (9) 10 C. J., p. 1077, n. 40.

4.  See 9 Cal. Jur. 562.
5.  See 19 Cal. Jur. 727; 20 R. C. L. 169.

APPEAL from a judgment of the Superior Court of Los Angeles County. L. H. Valentine, Judge. Reversed in part; affirmed in part.

The facts are stated in the opinion of the court.

Sarau & Thompson and B. P. Gibbs for Appellant.

W. W. Kaye and Alfred Siemon for Respondent.

BUCK, J., *pro tem.*—Action to recover damages sustained by plaintiff while a passenger on an auto-stage, operated by defendant Watson, which collided at a railroad crossing with an electric railway car operated by defendant Pacific Electric Railway Company.

On behalf of the plaintiff it was alleged that the collision resulting in plaintiff's injuries was caused by the concurrent negligence of the defendants. The case was tried with a jury, and at the close of the evidence offered on behalf of all parties the trial judge directed the jury to return a verdict against the plaintiff and in favor of the defendant Pacific Electric Railway Company, and a verdict in favor of the plaintiff and against the defendant Watson for such sum as they should assess as damages. The jury followed these directions and assessed damages against the defendant Watson in the sum of $7,500. From the judgment rendered against him Watson has appealed, and the plaintiff also has appealed from the judgment rendered in favor of the defendant Pacific Electric Railway Company and against plaintiff. By stipulation of counsel these appeals are heard together, and upon the same transcript prepared and certified under section 953a of the Code of Civil Procedure.

First, as to the appeal of plaintiff, wherein plaintiff claims that the court erred in directing a verdict against plaintiff and in favor of the defendant Pacific Electric Railway Company.

The accident occurred at a place on the highway where the highway is twenty-four feet wide and crosses a double track of the defendant Railway Company. The highway crosses at an oblique angle, extending from the southeast to the northwest, so that although the distance between the outside

rails of the two tracks, measured perpendicularly, is only nineteen feet, the distance traveled by the auto-stage in a northwesterly direction in passing over the tracks would be fifty-three and one-half feet. The evidence is that the stage was twenty-two feet long, with a seating capacity of about twenty passengers, and, before undertaking to cross the tracks as it was approaching them, stopped at a distance of from fifteen to twenty-five feet from the southerly rail of the first, or southerly, track. The electric car weighed 69,600 pounds, was fifty feet ten inches long and nine feet eight inches wide, and was approaching the crossing from the east, and collided with the auto-bus on the north rail of the northerly track while the bus was attempting to cross.

[1] Under the rule laid down in the case of *Billig* v. *Southern Pac. Co.*, 192 Cal. 357 [219 Pac. 992], it may be assumed that at least up to the time the bus stopped at a distance of about twenty feet from the southerly track, and while it was stopping there the motorman operating the railway car had "the right to presume" that the bus driver would exercise his faculties of observation and caution and would not essay a crossing until the danger due to the approaching car had passed, and that therefore the operator of the car up to that time was not bound to check the original speed of his car in approaching the crossing. Consequently, on this appeal the whole controversy touching the degree of care exercised and required to be exercised by the motorman pertains solely to the conduct of the railway motorman during the time while the bus was traveling on the highway a distance of about seventy-five feet from the place where it stopped on the highway up to the place where it was struck by defendant's approaching railway car on the north rail of the north track. Therefore, it does not seem that the above rule applied in the Billig case and cases cited therein would foreclose the following inquiries in the case at bar. But, on the contrary, taking the language of the decision in that case as a whole, they are quite pertinent. First, after the bus had stopped, did the railway motorman see the bus as it started up and see it as it continued to approach the railroad track on which his car was moving toward the crossing at the rate of thirty-five or forty miles an hour; and did he continue to see the bus as it crossed the first track,

going at the rate of about five miles per hour; and did he see the bus in its progress arrive at a point where it would reasonably appear that a collision with his approaching car was reasonably likely to occur unless something should be done by him to prevent it? Second, if the motorman did see all the foregoing, was he, when and if he saw the dangerous situation of the bus as it was so approaching the track, himself in a position and situation effectively to warn the driver of the bus of the imminent danger, or himself slacken the speed of his car so as to avoid the collision? Third, if the foregoing was the fact, did the motorman, as a matter of fact as a prudent man, exercise ordinary care in the use of the appliances at his command to warn the driver of the bus or to otherwise avert the collision?

At the close of the evidence offered by the plaintiff in support of plaintiff's contentions upon the foregoing propositions, the trial judge denied the defendant railway's motion for a nonsuit, giving as his reason therefor "that the inferences that must be indulged under the familiar rule respecting nonsuits were such in the circumstances as to require the court to deny the motion." But, as already noted, after the defendants had presented their testimony, much of which was in persuasive conflict with the testimony offered on behalf of the plaintiff, the court gave the instruction complained of herein, directing the jury to return a verdict in favor of the defendant Railway Company. Upon a review of the testimony it is apparent that this action of the court was based to a large extent upon the views entertained by the court as to the law covering his duty and power in the matter, as stated by the court as follows: "I did not permit full presentation of arguments *pro* and *con* on the motion for nonsuit, for the reason that I felt that the inferences that must be indulged under the familiar rule respecting nonsuits were such in the circumstances as to require the court to deny the motion. The case has reached a different stage. All of the testimony is in. A different rule prevails. The rule which guided the court in determining whether or not a new trial should be granted is the rule that guides the court at the present juncture of the case. All of the evidence is in. You all are familiar with the rule. It has been stated and restated time and time over. So that is what I have in mind at the present time."

[2] It is true that there are a number of cases whose language may be susceptible of the foregoing construction. But, on principle, it is evident that the consequences which follow from a directed verdict and from a new trial are so different that the rule applicable in the two instances should, in reason, not be the same. [3] This is clearly expressed by our supreme court in the case of *Estate of Caspar,* 172 Cal. 147 [155 Pac. 631], where the question was directly involved and the court stated as follows: "It is beyond controversy that the right of a court to direct a verdict is, touching the condition of the evidence, absolutely the same as the right of the court to grant a nonsuit. It may grant a nonsuit only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were given. Of course, if in such a case no motion for nonsuit has been made and the issues have been turned over to the consideration of the jury, and that jury has rendered a verdict in favor of plaintiff, such verdict being unsupported by any substantial evidence, it becomes the imperative duty of the court to set it aside. (*Estate of Arnold,* 147 Cal. 583 [82 Pac. 252]; *Estate of Chevalier,* 159 Cal. 161 [113 Pac. 130]; *Marron* v. *Marron,* 19 Cal. App. 326 [125 Pac. 914].) But, when, and only when, the evidence of the proponent is thus insufficient, the court may and should, as has been said, grant a nonsuit, and may and should on motion direct a verdict. . . .

"The rule as to directed verdicts is not that a verdict may be directed whenever the evidence is such that upon motion the court would grant a new trial. The court may grant a new trial even when there is substantial evidence to sustain the verdict, if it believes that the evidence preponderates against the verdict. It is under compulsion to order a new trial, and may do this of its own motion when the evidence is wholly insufficient to sustain the verdict. This is the meaning of the language in *Estate of Baldwin,* 162 Cal. 471 [123 Pac. 267], where it is said that a directed verdict is proper 'whenever upon the whole evidence the judge would be compelled to set a contrary verdict aside as unsupported

by the evidence.' For a detailed and satisfactory discussion of this proposition reference may be made to *McDonald* v. *Metropolitan Street Ry. Co.*, 167 N. Y. 66 [60 N. E. 282]."

See, also, *Kohn* v. *National Film Corporation of America,* 60 Cal. App. 112, at page 116 [212 Pac. 207].

[4] Therefore, in the case at bar, in determining the correctness of the court's action in directing a verdict, we should follow the rule indicated above and disregard all conflicts with testimony on behalf of the plaintiff, and resolve in plaintiff's favor every reasonable inference that may be drawn from testimony in his behalf.

And, first, as regards the knowledge of the motorman of any reasonable likelihood of peril attaching to the occupants of the motor-bus after the bus left its position of safety and was approaching the crossing toward which the motor-car was moving at the rate of forty miles per hour: One witness testified that when the bus stopped, as just stated, defendant's car was approaching the crossing at the rate of about forty miles per hour, and when the motor-bus stopped, defendant's car was at a distance of from ten to twelve hundred feet from the crossing. While another witness testified that at the time referred to defendant's railway car was at a distance of about eight hundred feet from the crossing. Defendant's motorman testified that he was at a distance of about five hundred feet from the crossing when he saw the auto-bus stop at a place about fifteen feet from the south rail of the south track, and that he continued to approach the crossing at that rate of speed until he was distant about 150 feet from the crossing, when, as he testifies, he blew a number of short blasts of the whistle and applied his emergency brakes, his testimony being as follows: "Q. You didn't blow the whistle and you didn't apply the emergency brakes until you got about 150 feet? A. Yes, sir, about that distance. Q. You say you saw the bus stop when you were at a distance of about 500 feet? A. Well, between four and five. I could not give the exact distance. Between four and five hundred. Q. You saw him start up immediately? A. No, sir, not immediately. It may be a second or so. Q. Well, you saw him start? A. Yes. Q. And you had your eyes on him all the time? A. Yes, sir. Q. And you went from where you saw him—you got to 150 feet before you blew the whistle or applied the emergency? A. Yes, sir.

Q. And, as a matter of fact, didn't you think all that time it was going to stop again? A. I didn't know whether he would stop a second time or not. Q. You didn't know whether he would? A. No, I didn't know what he was going to do. Q. Didn't you know, as soon as you saw him start again, that he was attempting to go ahead across in front of you? A. No, I figured he would hear the whistle, and that he would stop.''

[5] From the foregoing the jury could have believed that the motorman did, as a matter of fact, see the bus stop when he was at a distance, not of five hundred feet, but eight or ten hundred feet from the crossing. And, so believing, the jury could have drawn a reasonable inference not only that the motorman was in doubt, as he seemed to have been, as to whether the bus would stop again, but they could also have reasonably inferred that, as a prudent man, the motorman should and could have acted thereon by giving immediate warning, or by bringing his car to a stop before it was too late. And in this connection it was within the power of the jury and not the trial court to pass on the conflict in the testimony as to whether the motorman sounded the warning bell or as to whether he could have stopped within 250 feet or 125 feet. As stated in the case of *Thompson* v. *Los Angeles etc. Ry. Co.*, 165 Cal. 748, at page 752 [134 Pac. 709, 711] : ''We think it must be held that there was enough in the evidence to justify the jury in finding that the motorman was negligent in not giving proper warning by blowing the whistle of his approach. It is true that the only evidence that he did not give such warning was negative, consisting of the statements of the people in the automobile that they heard no signal. But if they were so situated, as they undoubtedly were, as to have been able to hear a bell or whistle sounded from the motor-car, their failure to hear is some evidence that no such signal was given. (Citing cases.) That there was positive testimony to the contrary does not conclusively establish that a warning was given.''

It would therefore seem from the foregoing, irrespective of what the opinion of the trial court or the appellate court might be as to the weight of the testimony, that in this case there was sufficient evidence to go to the jury to enable the jury to pass upon the conflicts in the testimony and the conflicting inferences that might be drawn therefrom, and

that it should be for the jury to determine, after hearing the testimony, whether the defendant was within the qualification of the rule laid down in the Billig case, as follows: "And it has accordingly been held that the operator of such train or car was not bound to check the otherwise rightful speed of his train or car in approaching and passing such crossing *until at least he has reason to believe that such person so approaching such crossing is not performing or is not likely to perform his duty in the foregoing regard.*"

And as regards the appeal of the defendant Watson from the judgment entered against him on the directed verdict: In the case of *Forbell* v. *Pacific Electric Ry. Co.*, 200 Cal. 718 [254 Pac. 890], the supreme court passed upon an instructed verdict given against the defendant Watson in an action arising out of this accident on behalf of another passenger in the bus. In that case the supreme court held that the trial court erred in instructing the jury that the defendant Watson was liable. But in the case cited it would seem from the opinion that the evidence relied upon by the court is not the same as the evidence in the case at bar. In the first place, the driver of the bus testified in the case cited, as stated by the court, that he was "unable, after glancing to the right and left, to see the approaching car of the defendant Electric Railway Company." But he fails to testify at all in the case at bar. And as regards the statement of the court to the effect that "a passenger sitting directly behind the driver testified that he was unable, after glancing to the right and left, to see the approaching car of the defendant Electric Railway Company," the court evidently refers to the witness Phillips, who testified in the case at bar that he occupied the second seat directly behind the driver, and when the bus stopped he stopped reading and looked at the driver, and when he started up, "I looked both ways, east and west. When I first looked up the driver was looking to the east. I looked to the east. I did not see any car. I did not look to the east before the bus started up. I looked to the east after the bus started up. When I was looking to the east, the bus was crossing the first two rails, that is, what we would call the east-bound track." From the foregoing it would appear that the passenger did not look to the east while the car

was stopped, as it was stopped about fifteen feet from the track. But he does testify that when the car stopped, "the driver was looking to the east." Furthermore, the witness testified that when he did look to the east, which was not at the point from which he says the driver looked to the east, he "did not see any street car approaching." Furthermore, the witness Phillips testifies, in effect, that what interfered with his vision when he was on the crossing were the poles of the electric car wires in between the two tracks. But he does not testify that these poles interfered with his vision, or anyone's vision, at the time the bus was stopped fifteen feet from the crossing. Also, in the case cited, as indicated in the opinion of the court, "the plaintiff himself testified that he was sitting on the second from the rear seat of the bus, and that he did not see the approaching car until the position of the bus placed him practically on a direct line therewith, thus tending to indicate that the electric car was not discernible until the bus was well upon the tracks of the defendant Railway Company."

In the case at bar, Mr. Forbell, who was the plaintiff above referred to in the case cited, testified that he was riding in the bus in the next to the rear seat; that the bus stopped approximately fifteen or twenty feet before it reached the railroad tracks: "I looked toward the east; the bus had started when I looked east. It was going over the first tracks on the south side. I saw a street car toward the east." The witness then indicated on the map where the car was, and pointed to a place about 350 feet from the crossing. "Just as soon as the bus started I looked to the west. I then turned around and looked to the east. And by that time the bus had started, and that is when I saw the car." It therefore fails to appear from the testimony in the case at bar, so far as Forbell's testimony is concerned, that the car was not discernible as it approached from the east before Forbell was crossing the track and while the bus was at a standstill. For he distinctly states that he did not look to the east until he was in a position on the track where he did see it.

Furthermore, in the absence of testimony of the driver of the bus in this case, there is no evidence whatever in the record that the bus driver could not or did not see the

approaching railroad car during the time when he had stopped the bus and the bus was standing within fifteen to twenty-five feet from the crossing, and at the time when other witnesses stated the driver did look to the east and in the direction where the car was approaching. But, on the other hand, there is affirmative evidence, without conflict, that during the time while the bus was standing still within fifteen to twenty-five feet of the crossing, passengers in the bus could and did see the approaching railway car, and passengers in the approaching railway car could and did see the bus at that time.

Admiral Barr was a passenger upon the bus, sitting in the second seat from the driver on the right-hand side. He testified that the bus stopped more than fifteen feet, "possibly twenty feet; maybe twenty-five feet" from the first track; that he looked to the east to see whether there was a car coming, and that when he first saw the car, "it was something near ten to twelve hundred feet below the crossing from the place where the accident happened. Q. Were there any objects of any kind between where you were sitting looking to your right the way this car was coming from to prevent the driver from seeing this electric car if he had looked? A. I don't see what it would be. There was nothing to hinder me from seeing. The Court: The question is were there any; did you see any? A. I did not. Q. (By Mr. Morris): You saw those poles along there, didn't you? A. Yes, sir. Q. Did they bother you about seeing this car? A. No, sir. . . . Q. After the bus had stopped and started up to go across the track, how fast did it go? A. Very slowly; two or three miles an hour. There is quite a raise there. He had to go up grade there. Q. You knew the car was coming? A. Yes, sir, I watched it almost continuously. Q. And you knew the bus was going? A. Yes, sir. Q. When the front of the bus had just passed the north rail of this lower track, where was the street car? A. Well, as I remember, it was about two and one-half poles away. Q. 250 feet? A. Something like that. Q. Did you see the driver look before he started the car? A. Yes, sir, I did. Q. Did he look in both directions? A. Well, he seemed to."

H. P. Shipman was a passenger on the railway car. He testified that he saw the bus stop at the crossing and at that

time he was at a point which was shown to be approximately 890 feet from the crossing, and that he did not notice the bus again until after the accident.

Samuel Moore, the motorman on the railway car, testified that he saw the bus stop approximately fifteen feet from the crossing, and at that time that he was about 500 feet away from the crossing, and he also saw the bus after it started up. "Q. As a matter of fact, you saw him stop and start up, both, didn't you; you saw him stop and start up immediately, didn't you? A. I did. Q. Your eye was on him continuously, wasn't it? A. He was always in front of me. I could not help but see him."

[6] As already noted, though the driver did not testify, other witnesses testified that when the driver stopped he looked to the east. And, as already noted, there is no evidence in the record that he could not see the approaching car at that time, but the evidence is to the contrary, that the car at that time was visible to any person looking for it in the direction and at the time that the testimony shows the driver did look toward it. It will, therefore, in the absence of any evidence to the contrary, be presumed that he did see what was visible. [7] Also it was his duty to presume that the motorman of the car in reasonable probability would continue up to and over the crossing without slowing down. [8] Therefore, the continuing duty rested upon the driver of the bus to use reasonable caution in the protection of his passengers from the further approach of the car, which it will be presumed he saw when he looked for it at the time he stopped. And that the bus driver neglected to perform this duty appears without conflict in the evidence.

[9] This case is, so far as the evidence is concerned, not within the facts appearing in the Tousley and Loftus cases in 166 Cal., at pages 457 [137 Pac. 31], and 465 [137 Pac. 34], respectively. In each of those cases the driver himself of the automobile testified he could not see the approaching railroad car. Consequently, the evidence in those cases did not, as in the case at bar, show conclusively that the driver, with an apparent willingness to take a chance, did leave a place of safety where he could see, as others saw, the approaching railway car a few seconds before the collision.

The judgment, therefore, in favor of the defendant Pacific Electric Railway Company and against the plaintiff is

reversed, and the judgment against the defendant Watson and in favor of the plaintiff is affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 20, 1927.

Shenk, J., dissented.