[Civ. No. 6243.   Third Appellate District.—June 16, 1939.]

In the Matter of the Estate of MARY ELLEN EAKLE, Deceased.   MARY ELLEN SWITZER et al., Respondents, v. WILLIAM HARRISON EAKLE, Appellant.

Arthur E. Miller, Irving C. Ford and Wilmer W. Morse for Appellant.

A. G. Bailey for Respondents.

TUTTLE, J.—This is an appeal from a judgment, order denying motion for new trial, and order denying a motion for judgment notwithstanding the verdict, in an action wherein the jury found for the contestants in a proceeding based upon objections to the probate of a will.

Opposition to the probate of the will was upon several grounds, including the unsoundness of mind of the testatrix, but respondents, at the trial abandoned all grounds except that of undue influence. The verdict of the jury was a finding to the effect that the execution of the will was procured by undue influence upon the part of William H. Eakle, the son of the testatrix, and judgment was entered accordingly, denying probate of the will.

The testatrix, Mary Ellen Eakle, was about eighty-five years of age when the will was executed. She had come to California as a child in a "covered wagon", and had resided in Yolo County all her life. In 1913 her husband died. Surviving him were testatrix and three sons. The father left an estate of considerable size—several hundred thousand dollars. The chief asset was the Eakle ranch, which was divided in partition equally between the three children, who, in turn, paid together to their mother the sum of $50,000 in cash. In addition, the children of son William received $10,000; the contestant Mary Ellen Switzer (sole child of son Henry) a like amount, and contestant Stephen, Jr. (sole child of son Stephen), a like amount. Stephen, Sr., lost his portion of the ranch by foreclosure about 1933. William lost his land in the same manner in 1936. Henry apparently had similar reverses, as the evidence shows that he was destitute and dependent upon his mother for support several years prior to his death. It also appears that about the time of the execution of the will, son William (contestee herein), was in the throes of bankruptcy. At the time of her death the testatrix was worth some $25,000.

It is the contention of appellant that the evidence is insufficient to support the verdict, and that the trial court therefore erred in denying a motion for judgment notwith-

standing the verdict. Respondents argue that the facts bring the case clearly within the rule laid down in *Estate of Graves,* 202 Cal. 258–263 [259 Pac. 935], where it is said:

"The rule is well settled that 'where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the will was not induced by coercion or fraud'. (*Estate of Baird,* 176 Cal. 381, 384 [168 Pac. 561]; *Estate of Nutt,* 181 Cal. 522, 528 [185 Pac. 393]), and that 'a presumption of undue influence arises from proof of the existence of a confidential relation between the testator and such a beneficiary, coupled with activity on the part of the latter in the preparation of the will'. (*Estate of Higgins,* 156 Cal. 257, 261 [104 Pac. 6, 8].) (*Estate of Relph,* 192 Cal. 451, 465 [221 Pac. 361].) Appellant did not sustain the burden cast upon him in the lower court, and has not satisfied us that the finding of the jury, and the consequent judgment revoking the will, are incorrect as matters of law."

This rule is further elaborated upon later in *Estate of Leahy,* 5 Cal. (2d) 301–304 [54 Pac. (2d) 704], in the following language:

"That such evidence may be sufficient to establish undue influence in the procuring of a will is confirmed by numerous decisions. Thus in an early case it was said: 'Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator.' (*In re McDevitt,* 95 Cal. 17, 33 [30 Pac. 101, 106].) Again it was said: 'While it is true that there must be proof that the influence was used directly to procure the will, general influence not brought to bear upon the testamentary act not being undue influence (*In re McDevitt,* 95 Cal. 17, 33 [30 Pac. 101]), such proof exists where the evidence is of such a nature as to warrant the inference that the will was the direct result of the influence exerted for the purpose of procuring it, and was not the natural result of the uncontrolled will of the testatrix. (See

*Estate of Arnold,* 147 Cal. 583, 589 [82 Pac. 252]; *Estate of Welch,* 6 Cal. App. 44, 50 [91 Pac. 336].' (*Estate of Snowball,* 157 Cal. 301, 307 [107 Pac. 598].)"

What are the circumstances in the record? At the time of the execution of the will proponent and his mother (testatrix), lived in Woodland, about 200 feet apart. Each visited frequently at the other's home. From 1930 to 1934 son Stephen, his wife and son Stephen, Jr. (one contestant), lived with testatrix, who expended several thousand dollars for his support, last illness, and funeral bills. Son Henry lived with his mother for the same period, and she supported him, paid his medical bills and funeral expenses.

Turning to the activities of contestee and proponent, and looking into the background, we find that, prior to the will, he borrowed several thousand dollars from his mother on his notes. One was paid off, and appellant "made" her destroy the other. He received money from her at other times. A servant testified that testatrix told her that proponent wanted her (the witness) "fired", as he needed the money, and witness was thereafter discharged by the mother. Testatrix told a witness that proponent did not want her to sell her ranch at Williams, because he wanted it for his children, and she said that she wanted Stevie and Helen to have a share of it. There was testimony to the effect that testatrix was weak in mind and body. In 1927 testatrix placed all her funds in the hands of witness Armfield, a Woodland attorney who had drawn the first will for her. We quote from the testimony of that witness. (The reference to "Will" is to proponent, and Henry was another son):

"A. Well, a great many times she talked to me on the proposition that Will and Henry would just abuse her and talk mean to her, until she would have to give them money and for me to pay to (no) attention to what they said, but to give her enough money, weekly or monthly, or, as she desired it, for her proper support and to refuse to give any money to the boys. Q. And did you obey those instructions during the time that you were the trustee? A. I did, even to the extent that, one time, I recall Will came to me with an order from Mrs. Eakle, asking me to pay Will $175.00 and I refused to give him the money. I remember another time she sent a minister to me. She had made a donation to the church of $250.00 and we refused to pay that and I talked to her about it and she said 'Oh, they made me

do it.' Q. Did you talk to her afterwards about that $175.00 order? A. Yes. Q. And what did she say? A. She said that Will just kept after her and she could not refuse him and for me to go ahead as I always had done. Q. And you did that? A. Yes, sir, I did. The whole thing ran along very satisfactorily so far as I know, until after the death of Steve and Henry. Henry died first and then Steve, within a few months. After that time there was a constant drive, so Mrs. Eakle told me, to get the money out of my hands and put it in Mrs. Eakle's own account to handle as she might please. I recall— Q. (Interrupting) Go ahead. A. (Continuing) I recall that Will and his wife came to my office at the bank one day and said, 'Mrs. Eakle—'this was after the death of Steve and Henry—'Mrs. Eakle wants you to place whatever balance she has, in her own separate account and give her a bank book so she can do as she pleases,' I said, 'That is all right with me, but Mrs. Eakle will have to tell me that herself.' So that night, on my way home, I stopped in to see Mrs. Eakle and told her what had occurred and she told me that I had done just exactly right and to pay no attention to what she might write or what she might do, but to keep the money and apportionate it out to her as I had done, and 'They'—she always usually spoke of the family as 'They'; that they constantly *hounded her to get the money within her control and to get it out of my control.''* There is testimony to the effect that proponent knew of a prior will which divided her property equally among the three sons, and that his mother was very affectionate toward him. Proponent testified that his mother trusted him. There is also evidence to the effect that proponent had charge of and worked his mother's ranch for several years prior to her death.

Coming to the execution of the will, it appears that R. L. Miller, of Oakland, California, had for some time been, and still was attorney for proponent, and had visited Woodland several times. On one of these occasions testatrix told Miller that she wanted him to draw her will ''sometime''. Miller testified that several days before the will was executed he wrote to proponent that he would be coming to Sacramento and would pass through Woodland the same day, and that he would draw the will for the mother if it was convenient. Asked if he had the letter or a copy thereof, he replied: ''I don't know whether I have or not. When I

say I think I wrote the letter, it may have been a telephone conversation with Mr. Eakle, because we had a number of telephone conversations in regard to his other business affairs, but I do recall letting him know that I was coming to Woodland.'' Appellant testified that *he* did not make the appointment, and that it may have been made by his wife. The latter was not called to testify on the point. There is no evidence that the appointment was made by, or at the request of the *testatrix*. Appellant testified that he had not told his mother that the attorney would be there on that day. Referring to the manner in which the appointment with attorney Miller was made, appellant testified:

''Q. Who made the appointment? A. I did not make it. Q. Did you write a letter for your mother? A. No, I did not. Q. Did your wife write a letter for your mother? A. She might have. Q. Did you call him on the telephone? A. No. Q. Did your wife call him on the telephone? A. She might have. Q. Well, do you know? A. No, I do not. Q. Did you hear her? A. No. Q. You did not hear it? A. No.''

In our opinion, from the evasive attitude of appellant, the jury could well have inferred that he himself was instrumental in having the entire matter concluded on that day. When Miller arrived in Woodland he went directly to the home of appellant, where he found the latter and his wife and testatrix. In the presence of all of them, Miller and testatrix talked over the terms of the will, and it was then and there written up on a portable typewriter belonging to Miller, and executed, with Miller and his friend Peters as witnesses. The latter was brought along for this express purpose.

We are satisfied that the evidence is sufficient to support the verdict under the rule quoted from *Estate of Graves* (above), and *Estate of Baird*, 176 Cal. 381 [168 Pac. 561]. First, there is sufficient evidence of the existence of confidential relations between proponent and his mother. There are a number of facts which lead to this conclusion. Among them are: the close and intimate relationship between them; the act of the mother in turning over her ranch to the son to work; the testimony of the son that ''his mother trusted him''; the testimony of witness Catherine Eakle,— ''He took over his mother's affairs and she was guided by

his advice'';—and the relationship of mother and son. The blood relationship alone will justify a finding that confidential relations existed (see authorities cited in discussion of instructions). In addition, there are the other facts which tend to prove the existence of the fact under discussion. It is true that the testimony of the former attorney for testatrix, would tend to prove otherwise, and show that she placed her property in trust to escape the management of her affairs by her three sons. At the most, however, this raises a conflict on the issue, and the determination of the jury is therefore final on appeal. Second, appellant was active in the preparation of the will. His attorney was summoned from Oakland through no act of the testatrix, and the jury could reasonably have inferred that proponent had something to do with the presence of the attorney in Woodland when the will was drawn. The instrument was drawn at the home of appellant, and the terms thereof were discussed in his presence. The mother afterwards handed it to appellant, who retained it until her death. Third, appellant unduly profited by the terms of the will. Under the prior will in evidence, the property was divided equally between the three sons. In the event of intestacy appellant would receive but one-third of the property. Concluding our discussion of the sufficiency of the evidence, the following excerpt from *Estate of Graves* (above), expresses our view:

"While none of these circumstances, standing alone, has the effect of creating a *presumption* against the validity of the instrument, their probative force, in combination, is to impose upon the proponent the obligation of presenting evidence of volition, and to make the question as to undue influence one of fact for the jury's determination."

█ The only other ground relied upon for reversal is in connection with the instructions. At the request of respondents, the court gave the following instructions:

"You are also instructed that where a person who unduly profits by a will, sustains a confidential relation to the testator and has actually participated in procuring the execution of the will, the burden of proof is upon him to show that the will was not induced by undue influence; and if that burden has not been met, that is, if such a person has failed to show, by a preponderance of the evidence, an absence of

such undue influence, then the presumption controls and such will is invalidated.

"You are also instructed that if you find that the proponent stood in a confidential relation to the decedent and participated in the procurement of the will, that the burden of proof is upon the proponent to establish that said will was not procured by his undue influence, and if said proponent fails to prove by a preponderance, that is, by the greater weight of evidence, that he did not unduly influence said decedent, then you will find for the contestant."

At the request of appellant the court also instructed the jury as follows:

"In contests of this character the burden of proof always rests upon the contestants. They must establish the allegations of their contest affirmatively, and by a preponderance of evidence. If the evidence is evenly balanced or if there is any doubt in your minds on which side the evidence on any issue which the contestants must prove preponderates, then the contestants have failed to establish that issue and as to that issue your verdict should be against them."

It is contended by appellant that the first two instructions are not correct statements of the law, in that: "The contestants at all times have the burden of proving their case by a preponderance of the evidence and when they have made out a *prima facie* case the burden which shifts to the proponent is not to overcome their showing by a preponderance of the evidence but merely to produce sufficient evidence to offset the effect of the contestants' showing;" and he cites *Scarborough* v. *Urgo,* 191 Cal. 341 [216 Pac. 584], *Valente* v. *Sierra Ry. Co.,* 151 Cal. 534 [91 Pac. 481], and *Estate of Erickson,* 140 Cal. App. 520 [35 Pac. (2d) 628]. We agree with appellants. The instructions were erroneous. "In the rebuttal of a presumption *it is not necessary to produce preponderating evidence.* A presumption is overcome by evidence sufficient to balance it." (10 Cal. Jur., p. 752, par. 66.) "It is the general rule that the burden of proof as to the issues of fraud or undue influence is on the contestant or party who alleges their existence and exercise, and that such burden never shifts, although where the contestants establish a *prima facie* case, the person charged with fraud or undue influence has the burden of meeting it." (68 C. J., p. 755, sec. 449.) Furthermore, the error was ag-

gravated by the fact that the second of these instructions omitted to give the third element necessary to raise the presumption of undue influence,—the fact that proponent must have unduly profited by the will.

The jury were also instructed that confidential relations were presumed to exist between "parent and child". The rule is that proof of the fact that the parties are mother and son is proof that the relation of confidence existed. Our courts do not stop with the holding that under such conditions a presumption of confidential relations arises, but they go further and say that the blood relationship actually proves confidential relations. In the early case of *Robins* v. *Hope,* 57 Cal. 493–497, it is said:

"The phrases 'confidential relation' and 'fiduciary relation' seem to be used by the courts and law writers as convertible terms. It is a peculiar relation which undoubtedly exists between 'client and attorney', principal and agent, principal and surety, landlord and tenant, *parent and child,* guardian and ward, ancestor and heir, husband and wife, trustee and *cestui que trust,* executors and administrators and creditors, legatees and distributees, appointer and appointee under powers, and partners and part owners. In these and the like cases the law, in order to prevent undue advantage from the unlimited confidence, affection, or sense of duty which the relation naturally creates, requires the utmost degree of good faith (*uberrima fides*) in all transactions between the parties. (1 Story's Eq. Jur. 218.)"

The later case of *Hemenway* v. *Abbott,* 8 Cal. App. 450–463 [97 Pac. 190] (opinion on rehearing—opinion by this court)—and *Bacon* v. *Soule,* 19 Cal. App. 428–434 [126 Pac. 384], use practically the identical language found in the Robins case. The instruction, while not an accurate statement of the law, was not prejudicially erroneous, in that the only error committed was failure to state the law against appellant as strongly as it might have been stated.

The following instruction was given:

"You are also instructed that the presumption of undue influence arises from proof of the existence of a confidential relationship between a testator and his beneficiary coupled with activity on the part of the latter in the preparation of the will."

This instruction omitted the third element necessary to give rise to the presumption—the fact that proponent unduly profited under the will—and it was therefore erroneous.

Objection is also made by appellant to this instruction upon the ground that the proof of the three elements, under the rule in *Estate of Graves* (above), does not give rise to a presumption but merely constitutes a showing from which the jury *may* deduce that undue influence has been exercised; hence, such proof simply lays the ground for an inference. The cases cited above—*Estate of Graves* and *Estate of Baird* —definitely hold otherwise, to the effect that such proof gives rise to a *presumption* of undue influence. The contention is without merit.

It is stated by respondents that all of these instructions were given in *Estate of Graves* (above), and approved by the Supreme Court. The only reference made to such instructions in that case is as follows: "In answer to other contentions by appellant, it may be said that the trial court correctly instructed the jury at length, with a great deal of detail." We have not examined the record in *Estate of Graves,* but assume that counsel is correct in his statement. However, we do not regard instructions which are not directly passed upon by the appellate court, but which are given such a "blanket endorsement" as definitely establishing the law.

We do not believe that article VI, section 4½, of the Constitution is applicable here. Similar instructions were held to be prejudicially erroneous in *Estate of Erickson,* 140 Cal. App. 520–526 [35 Pac. (2d) 628]. It is true that the trial court here gave the usual and proper instruction (quoted above) to the effect that contestants must establish their case by a preponderance of the evidence, but to say elsewhere that contestee must overcome the presumption of undue influence by a *preponderance of evidence* on his part, is contradiction with attendant confusion.

We conclude by stating that we cannot say, after an examination of the entire record, that the jury would have reached the same conclusion had these instructions been correct statements of the law.

The judgment and orders are, and each of them is, reversed.

Thompson, J., and Pullen, P. J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 14, 1939.