161 Cal.App.2d 289 (1958)
Estate of ALICE CATHERINE BOURQUIN, Deceased. SUNLAND HOME FOUNDATION, INC., et al., Appellants,
v.
PAUL EUGENE BOURQUIN, Respondent.
Civ. No. 5824. 
California Court of Appeals. Fourth Dist. 
June 12, 1958.
 Charles E. Burch, Jr., and John Mason Jeffrey for Appellants. *292
 David H. Thompson for Respondent.
 MUSSELL, J.
 This is an appeal from a judgment and order denying admission to probate of a will executed by the decedent on June 13, 1956, and admitting to probate a will executed by her on July 19, 1944. The trial judge found that the testatrix was incompetent to make the will of June 13, 1956, due to her mental and physical condition and that she was subjected to restraint and undue influence on the part of the agents, employees, officers and members of the Sunland Home Foundation, Inc., and the Second Church of Christ Scientist of San Diego, appellants herein.
 Alice Catherine Bourquin, aged 65, died June 13, 1956, leaving surviving her as her sole heir at law a married son, Paul Eugene Bourquin, 39 years of age, contestant herein. Her husband, Albert Georges Bourquin, died on July 5, 1955, after a heart attack. Mrs. Bourquin left an estate appraised at $32,992.14. It consisted of bank accounts totaling $1,798.69, corporate stock valued at $13,593.96, a 1950 Chevrolet automobile, household furniture and furnishings, real property valued at $16,000, and miscellaneous personal property.
 In her will of June 13, 1956, the testatrix gave the sum of $3,000, certain cemetery lots, and miscellaneous personal property to her son, Paul. Her car was given to her friend, Jeanne Belanger. The sum of $2,000 was given to the Second Church of Christ Scientist of San Diego. The rest and remainder of her estate was given to the Sunland Home Foundation and the will further provided that in the event that distribution could not be made to said church, the remainder of her estate was given to the San Diego State College, a state institution. This latter provision was inserted in the will by the attorney who drew it to validate the bequest to the Sunland Home Foundation in the event the testatrix died within 30 days from the date of the execution of the will.
 In the summer of 1954 Mrs. Bourquin suffered a heart attack and was hospitalized at Paradise Valley Sanitarium in Chula Vista, California. Her condition improved and she returned to her home, although she had a greatly enlarged heart. On May 29, 1956, she suffered a major heart attack at her home and was taken to Villa View Hospital in San Diego where she was placed under the care of Dr. Harvey Gassman, an internist specializing in cardiology. The doctor found her to be in a critical condition. "She was orthopneic and cyanotic. Her lips were blue. She had a rapid respiratory *293 rate. The heart was tremendously enlarged and dilated. There was evidence of congestion in both lungs and there was impairment as far as her ability to talk and give concise history due to gasping respirations." She had pitting of the extremities and "the urinary analysis showed evidence of albumen, which meant there was some evidence of arteriosclerosis in the arteries of the kidney." An electrocardiagram was taken which "showed a left bundle branch block with hypertrophy and strain, which means it shows a heart that has been tremendously strained for a period of years due to hypertension and coronary insufficiency." Dr. Gassman's diagnosis was "one of arteriosclerotic heart disease" and he prescribed bed rest, digitalis, low salt diet and mercuhydrin, together with oxygen when necessary. In this connection the doctor testified that the result of this treatment, while at Villa View Hospital, was that the congestion which was found at the time of initial examination had disappeared and that the dyspnea, orthopnea and cyanosis had subsided, and the pitting edema of her extremities had also disappeared.
 On June 4, 1956, Mrs. Bourquin had improved and Dr. Gassman authorized her to be taken to the Bel Air Terrace, an adjoining hospital, where she could be given her medication and diet. On that date the doctor made the following entry on the Villa View Hospital record: "Patient has improved but is in need of convalescent care and must be taking her digitalis every day in order to prevent recurrent heart failure."
 On June 4, 1956, the testatrix, in the company of a Christian Science practitioner and a Christian Science nurse, went to the Sunland Home, a Christian Science rest home operated by Sunland Home Foundation, Inc., and from that date until her death on June 13, 1956, she received no medication or medical services. The record shows that doctors were not permitted to treat patients in the Sunland Home.
 Mrs. Bourquin was found dead in her room at 3:45 p. m. on June 13, 1956, by one of the nurses at the home. The coroner of San Diego County, after an investigation by one of his autopsy staff, reported the cause of her death to be acute pulmonary edema due to cardiac failure, due to arteriosclerotic heart disease.
 Mrs. Gillard, who was manager of the Sunland Home, stated in her deposition that one day when she went to Mrs. Bourquin's room Mrs. Bourquin asked her to call a lawyer and *294 stated that she did not have one and did not know anyone, and that she wished to change her will. At the trial Mrs. Gillard testified that Mrs. Bourquin asked her what lawyer she and her husband used and Mrs. Gillard told her that she knew of two attorneys who belonged to her church and named Mr. John Jeffrey, who had provided legal services for the home on several occasions.
 On June 12, 1956, Mr. Jeffrey received a call from Mrs. Gillard at about 8 or 9 p. m. in which she asked him to come to the home to draw a will for a lady. He agreed to go and asked if there were any urgency about it, to which Mrs. Gillard replied, "None that she knew of, but that, of course, it was a heart case." Mr. Jeffrey arrived at the home at about 8:30 a. m. on June 13, 1956, discussed the terms of the will with Mrs. Bourquin for about 15 minutes, and then typed it on his own portable typewriter which he had brought with him for that purpose. The will was then signed and witnessed and taken by Mr. Jeffrey to his office.
 The principal question on this appeal is whether there is substantial evidence in the record supporting the finding of the trial court that the testatrix was incompetent to make her will of June 13, 1956. There is a conflict in the evidence in this connection. The witnesses to the will and others connected with the Second Church of Christ Scientist or the Sunland Home testified that Mrs. Bourquin was competent at all times from June 4 until the time of her death and that they saw no evidence of any change in her condition or any particular breathing difficulties. However, Mrs. Jeanne Belanger, a close friend of decedent, visited her at 3 p. m. on June 13, 1956, and testified as to her condition as follows:
 "Q. Now would you describe very carefully to the Court the condition Mrs. Bourquin was in when you saw her at 3:00 o'clock that afternoon?"
 "A. Well, she was sick, very, very sick. And she just can't breathe. Her lips was purple. Skin very white and--she would take about twenty seconds before she could say a word, you know, just try to talk. So she said, the first word she said, she says, 'I wish I be in my home,' she says. 'I need oxygen.' So I said, 'I going to call the doctor for you.' She then told me, 'They don't want to let any doctor come in here.' "
 The record shows that Mrs. Bourquin had consulted Mr. Hussey, an attorney in Lemon Grove, on two occasions, on September 1 or 2, 1955, at which time she inquired as to the necessity of probating her husband's will and again in March, *295 1956, to inquire whether it would be necessary for her to make a will more recent than the one which she had made on July 19, 1944. (This was the will which was admitted to probate herein by the trial court.) Mr. Hussey asked her if she wanted her property to go to her son, Paul, and when she answered in the affirmative, he advised her that no additional will would be necessary.
 It further appears that Mrs. Bourquin requested Mr. Jeffrey to provide in her will that all her cemetery lots at Valley Forge, Pennsylvania, approximately 12 in number, be bequeathed to her son, when in fact she owned 21 cemetery lots at Valley Forge; that she did not inform Mr. Jeffrey that her estate included corporate stock of a value in excess of $13,500; that she did not tell him that there were 100 shares of Investment Company of America stock standing in her name, and that these shares belonged to Mrs. Belanger; and that she did not inform him that she had previously made a will leaving all her property to her son, Paul. Mrs. Belanger testified in this connection that at about 3 p. m. on June 13, 1956, Mrs. Bourquin asked her to go and get one of her stocks, that she thought she didn't have enough money in her savings account to pay the bill. The record shows that Mrs. Bourquin had $1,798.69 in the bank at that time and that her total outstanding bills amounted to $380.24.
 The testimony also indicates that Mrs. Bourquin read the will when it was presented to her for signature and failed to observe that her middle name was misspelled in the caption and in the first sentence of the will. In furnishing information for her admission to the Sunland Home, Mrs. Bourquin stated that she was born on March 2, 1881, when in fact her birthdate was 10 years later. She also stated that her son had attended Christian Science Sunday School for a period of seven years, when in fact he had attended said school for a period of eight months only. The record further shows that the testatrix had made the statement to one of the witnesses that her son had lied to her and that this statement was not true.
 Mildred Dilley, one of the decedent's neighbors, testified that after Mr. Bourquin's death in 1955, Mrs. Bourquin became physically weaker; that her mental outlook changed; that she became irritable; that she became critical of other people and dissatisfied with everybody and everything; that she visited Mrs. Bourquin at the Sunland Home and observed that she was very tired and was gasping for breath. Lillian Nachison, another neighbor, testified that after 1955 she *296 noticed a change in Mrs. Bourquin; that she became more irritable with everyone around her. Mr. Blanc, who had known the decedent for many years, testified that he visited her at the Sunland Home on June 6, 1956; that Mrs. Bourquin was then very ill; that she could not get her breath; that she could hardly talk without gasping for breath; that her lips were purple and her face and neck were swollen. Mrs. Blanc testified that she was present on this occasion and that Mrs. Bourquin was much worse than she was when she was at the other hospital; that she was perspiring, talked nervously, and was short of breath; that her hands were clammy and her face very white.
 Evidence was also introduced to the effect that Mrs. Bourquin's condition became worse after June 8, 1956; that she had spells of heavy coughing and vomiting and that a special nurse was in attendance.
 Dr. Gassman, basing his testimony upon that of the contestant's witnesses concerning the physical and mental condition of Mrs. Bourquin prior to May 29, 1956, his examination of the Paradise Valley Hospital records of her hospitalization in 1954, his own examination and treatment of the decedent from May 29, 1956, to and including June 4, 1956, his examination of the nurses' records and other hospital records of the Sunland Home covering the period from June 4 to and including June 13, 1956, and upon the testimony of contestant's witnesses concerning their observations of her physical condition during a portion of the latter period, and the coroner's report, testified unequivocally that Mrs. Bourquin could not have had sufficient mental ability at 10 a. m. on June 13, 1956, to understand the nature of the act of making a will, to understand the extent and character of her property, and to understand her relation to the persons who had claims on her bounty or whose interests were affected by such act. He further testified that this would have been true for a period of at least 12 hours prior to her death. He further testified as follows:
 "Judging from the complexity of the will that was just read to me and concentrating as much as I was possibly able to do so, try to understand everything, judging from the evidence that was given to me as far as the patient's condition and the time she expired in relationship to this will with the time she expired, I would say she was not mentally competent enough to comprehend the contents of that will."
 In this connection, Dr. Edgar, who was called as a witness *297 for the proponents, in testifying as to the cause of Mrs. Bourquin's death, stated as follows:
 "Well, I think from my examination of these records that it can be very little doubt that she did die of the cause as stated in the autopsy report, namely, complication of atherosclerotic heart disease. Dr. Gassman had indicated that in his opinion, this is when she left the hospital, if she did not continue her medication she would certainly suffer a relapse, and I think he was correct, I think that is what happened."
 It is not within our province to here decide whether the testatrix was competent to execute the will dated June 13, 1956. That question is one of fact for the trial judge. [1] As was said in Estate of Frank, 102 Cal.App.2d 126 [226 P.2d 767]:
 "The function of an appellate court is no different on an appeal from a judgment denying probate of a will because of mental incompetency than in any other case. 'All conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial judge or jury. (Estate of Bristol, 23 Cal.2d 221 [143 P.2d 689]; Estate of Teel, 25 Cal.2d 520 [154 P.2d 384].)' (Estate of Trefren, 86 Cal.App.2d 139, 142 [194 P.2d 574].)"
 [2] It was further said in that case that "While it is true that the critical inquiry in determining the mental capacity of a person to execute a will is his condition of mind at the time of its signing, nevertheless, proof of the unsoundness of mind of a testator and of the facts upon which his state of mind depends is not necessarily confined to the exact time of the execution of the will. Evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, are admissible so long as they have a reasonable tendency to indicate his mental condition at the time the will was executed. (Citations.)" And that
 [3] "The testimony of witnesses who were present at the time of the execution of a will as to the soundness of mind of the testator is not conclusive against the testimony of other witnesses who saw the testator within a few days of the execution of the will and the other circumstances in the case."
 [4] In Estate of Sexton, 199 Cal. 759, 764 [251 P. 778], it is said: "A testator is of sound and disposing mind and *298 memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument."
 In Estate of Fosselman, 48 Cal.2d 179, 185 [308 P.2d 336], it is held that "Testamentary incompetency on a given day, however, may be proved by evidence of incompetency at times prior to and after the day in question."
 [5] A review of the entire record herein under the rules stated leads us to the conclusion that we cannot hold as a matter of law that there is no substantial evidence to support the finding of the trial judge that the testatrix was not competent to make a will on June 13, 1956, because of her condition of extreme mental and physical weakness.
 Appellants assert that the testimony of Dr. Gassman does not amount to substantial evidence of incompetency of the testatrix to make a will. Citing Estate of Bullock, 140 Cal.App.2d 944 [295 P.2d 954, 297 P.2d 633], wherein it was held that the conclusion of a doctor that the testatrix was incompetent to make a will amounted to no more than his belief that she was of unsound mind in the medical sense. However, as the court remarked, the doctor was not asked whether or not the testatrix was capable of recalling the nature and extent of her estate, the natural objects of her bounty, and of understanding the nature of the act she was doing, and in the absence of evidence to the contrary, it must be presumed that she did. In the instant case, the legal question referred to was asked of Dr. Gassman and answered by him. He was thoroughly aware of the serious condition of the testatrix while she was in the Villa View Hospital under his care a few days before her death. He testified that in his opinion Mrs. Bourquin was suffering from cerebral anoxia during her entire stay at the Sunland Home; that she suffered from an impaired oxygenation due to decreased circulation and pulmonary congestion and that her speech and judgment were impaired; that her condition became more acute and that her judgment was reduced sufficiently to make her mentally incompetent to comprehend the act of making a will for at least 12 hours before her death. Dr. Edgar, appellant's own witness, agreed with Dr. Gassman in the opinion that if Mrs. Bourquin did not continue her medication when she left the hospital, she *299 would certainly suffer a relapse, and that that is what happened.
 [6a] There is also substantial evidence to support the findings and judgment of the trial judge that the will involved was the result of undue influence. [7] The indicia of undue influence have been stated as follows: (Estate of Lingenfelter, 38 Cal.2d 571, 585 [241 P.2d 990].)
 " '(1) The provisions of the will were unnatural. ... (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed.' (Estate of Yale, 214 Cal. 115, 122 [4 P.2d 153].) These, coupled with a confidential relationship between at least one of the chief beneficiaries and the testator, altogether were held 'sufficient to shift the burden to the proponents of the will to establish an absence of undue influence and coercion and to require the issues to be determined by the jury.' (Estate of Yale, supra, p. 123.)"
 [6b] In the instant case the record shows that the testatrix, having previously willed all her property to her only son, gave the bulk of her estate to the Sunland Home Foundation by the will involved and to the San Diego State College in the event that distribution could not be made to the Second Church of Christ Scientist.
 The record shows that from June 4, 1956, until the date of her death the testatrix was subjected to Christian Science teachings by nurses in the Sunland Home or by a Christian Science practitioner and also by a loud speaker system in her room. The record indicates that the Christian Science practitioners who attended the testatrix and the agents, employees and/or officers of the Sunland Home Foundation and Second Church of Christ Scientist held a confidential relationship to the testatrix as religious counselors. There is evidence that those in charge of the testatrix at the home did not advise her son of her dangerous condition and that the switchboard operator at the home was instructed by the manager to allow the testatrix no visitors or telephone calls after about June 10, 1956. There is evidence that Mrs. Bourquin's mental and physical condition while at the Sunland Home was such as *300 to permit subversion of her freedom of will and in this connection Dr. Edgar testified that Mrs. Bourquin's disease was one that made her more susceptible to influence than if she did not have the disease and that a suggestion coming from a person occupying a dominant position, such as an attorney, a doctor, a teacher, or close friend, would influence her more than a stranger would.
 There is evidence that the chief beneficiaries under the will were active in procuring its execution. Mrs. Gillard recommended and called the attorney, Mr. Jeffrey, who was a member of the Christian Science Church, to prepare the will and it was prepared under his direction. [8, 9] In Estate of Pellegrini, 138 Cal.App.2d 143, 145 [291 P.2d 558], it was held that
 " '... [w]here one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the testamentary document was not induced by coercion or fraud. When proof of the existence of a confidential relationship between the testator and such a beneficiary (one who unduly profits by the will), coupled with activity on the part of the latter in the preparation of the will, is offered, a presumption of undue influence arises therefrom.' (Citations.) 'The rule is firmly established in California that when the contestant has shown that the proponent of a will sustains a confidential relationship toward the testator, and actively participates in procuring the execution of the will, and unduly profits thereby, the burden then shifts to the proponent to prove that the will was not induced by his undue influence. (Citations.)' "
 [10] In Estate of Anderson, 185 Cal. 700, 708- 709 [198 P. 407], it is said: " 'Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator. ...' "
 [6c] Under the facts and circumstances here shown we cannot say as a matter of law that the finding of undue influence is not supported by substantial evidence.
 [11] Appellants claim that the court erred in permitting the introduction of secondary evidence of a letter written by the *301 testatrix to her son, Paul. This letter was destroyed by him and he testified in general as to its contents. However, his testimony in this connection indicates that the letter was destroyed prior to any knowledge on his part of the existence of the will in question and it does not appear that there was any prejudicial error in the admission of oral testimony as as to the contents of the letter. [12, 13] As is said in Hausen v. Goldman, 124 Cal.App.2d 25, 30 [267 P.2d 852]:
 "The rule is established in California that the sufficiency of the preliminary proof of the loss of a document before testimony as to its contents is received is addressed to the sound discretion of the trial judge (Citation.), and that the determination of the trial judge that substantial evidence has been introduced to show the loss or destruction of the original document will not be disturbed by an appellate court, in the absence of a showing that the proof of loss or destruction was manifestly insufficient (Citations.)."
 Judgment affirmed.
 Barnard, P. J., and Griffin, J., concurred.