[Civ. No. 7609. Fourth Dist. Mar. 30, 1965.]

Estate of LUCY T. BECKLEY, Deceased. SAN DIEGO HUMANE SOCIETY et al., Contestants and Appellants, v. LAWRENCE C. KUEBLER, as Executor, etc., et al., Defendants and Respondents.

Hillyer, Crake & Irwin, Brooks Crabtree, Higgs, Fletcher & Mack, Oscar F. Irwin, Thomas C. Harden, Ferdinand T. Fletcher and Edward M. Wright for Contestants and Appellants.

McInnis, Focht & Fitzgerald and John W. McInnis for Defendants and Respondents.

COUGHLIN, J.—Lucy T. Beckley executed her will on February 18, 1959. She died about two years later, i.e., on March 31, 1961. Thereafter her will was admitted to probate. The chief beneficiaries under prior wills, i.e., San Diego Humane Society, a corporation, and The San Diego Society for Crippled Children, a corporation, filed a petition seeking revocation of probate upon the grounds that at the time of the execution of her will (1) she was of unsound mind and (2) acted under undue influence. At the close of contestants' case the court granted a motion for nonsuit on the issue of undue influence as to one of the proponents. After both sides concluded their cases the court granted proponents' motion for a directed verdict. Judgment denying revocation of probate was entered accordingly. The contestants appeal from the judgment and the order of nonsuit.

The primary issue for determination by this court is whether there is substantial evidence in support of either ground of contest, i.e., (1) that at the time of the execution of the will Mrs. Beckley was of unsound mind, or (2) that in executing the same she acted under undue influence.

The rules of law applicable to such a situation are well settled. The problem presented concerns the applicability of those rules to the evidence at hand and the propriety of the conclusion of the trial court in the premises.

Where, from a consideration of the whole evidence, it appears that a judgment in a will contest on a verdict in favor of contestants finding unsoundness of mind or undue influence would be reversed on appeal because of the insufficiency of the evidence to support such, a motion for a directed verdict in favor of the proponents should be granted. (*Estate of Lances,* 216 Cal. 397, 401 [14 P.2d 768] ; *Estate of Baldwin,* 162 Cal. 471, 473 [123 P. 267].) Proponents rely upon the rule as stated in several will contest cases that:

"To warrant a court in directing a verdict, it is not necessary that there should be an absence of conflict in the evidence, but, to deprive the court of the right to exercise this power, if there be a conflict, it must be a substantial one." (*Estate of Baldwin, supra,* 162 Cal. 471, 473; *Estate of Finkler,* 3 Cal.2d 584, 591 [46 P.2d 149] ; *Estate of Sharon,* 179 Cal. 447, 459 [177 P. 283] ; *Estate of Smethurst,* 15 Cal.App.2d 322, 330 [59 P.2d 830]) ; and that to determine whether the conflict is substantial requires at least a comparison of the substance of the conflicting testimony. (*Estate of Smethurst, supra,* 15 Cal.App.2d 322, 326, 330 ; see also *Estate of Ventura,* 217 Cal.App.2d 50, 63 [31 Cal.Rptr. 490].) However, it also has been said in such cases that,

"In determining whether, in a proceeding to contest a will, the evidence produced by the contestant is sufficient to require the submission of the case to the jury, the same rules apply as in civil cases. [Citations.]

". . . a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.]" (*Estate of Lances, supra,* 216 Cal. 397, 400.)

A consideration of the total evidence in the instant case, in the quest seeking a determination whether the evidence upon which contestants rely to support their position is substantial, poses the temptation to weigh the sufficiency thereof as a matter of fact rather than to determine its sufficiency as a matter of law to support that position.

Upon the issue of mental unsoundness the question at hand is whether there is any substantial evidence showing that at the time of the execution of the will Mrs. Beckley did not have sufficient mental capacity to be able to understand the nature of the act she was doing; to understand and recall the nature and situation of her property; and to remember and understand her relationship to the persons who have claims upon her bounty and whose interests are affected by the provisions of her will. (*Estate of Fritschi,* 60 Cal.2d 367, 372 [33 Cal. Rptr. 264, 384 P.2d 656] ; *Estate of Lingenfelter,* 38 Cal.2d 571, 582 [241 P.2d 990] ; *Estate of Finkler, supra,* 3 Cal.2d 584, 593 ; *Estate of Bourquin,* 161 Cal.App.2d 289, 297 [326 P.2d 604].)

■ On February 3, 1959, Lucy T. Beckley, when approximately 93 years of age, suffered a broken arm and was hospitalized. While in the hospital she was ''involuntary'' and bedfast. On February 17, the day before being taken from the hospital, she consulted with an attorney named Atherton concerning the execution of a will; advised him of her wishes in the premises; and asked that a will be prepared accordingly. In response to this request, Atherton prepared a will; took it to the hospital the next morning; and attended upon its execution. The testimony of two medical doctors who attended Mrs. Beckley while she was in the hospital, that of the attorney who prepared and witnessed the will, that of the latter's secretary, who also witnessed the will, and that of the two beneficiaries of the will, supports the conclusion that at the time of its execution Mrs. Beckley was of sound mind. By the will one-half of the estate was given to a man named Kuebler, whom Mrs. Beckley had known from childhood and regarded as her son, and one-half in trust to Kuebler for the benefit of her grandniece, with remainder over to the latter's children upon termination of the trust.

Atherton had been Kuebler's attorney and consulted with Mrs. Beckley on the occasion in question at Kuebler's request.

Contestants were contingent beneficiaries under a will Mrs. Beckley had executed in 1950 which left the bulk of her estate to her husband and, in the event he predeceased her, to the contestants in equal shares. Mr. Beckley died in 1958.

After Mr. Beckley's death Kuebler assisted Mrs. Beckley in many ways, including business matters relating to her husband's estate. There is an abundance of evidence from which it may be concluded that a confidential relationship existed between Kuebler and Mrs. Beckley. In the 1950 will he had been named as an alternate executor, to act in the event her husband predeceased her. In that will the grandniece was given a small legacy.

In support of their contention that Mrs. Beckley was not of sound mind at the time she executed the subject will the contestants direct our attention to the testimony of a witness named McCown, who was the husband of a niece of Mr. Beckley. McCown testified that he had known Mrs. Beckley for a long time, and had visited her often; that she was friendly toward him; that while she was in the hospital he visited her four times, the last occasion being either on February 12th or February 14th; that on at least two of these occasions she did not recognize him; that she did not converse with him;

that she stared at him; that during the period of a year prior to her admission to the hospital she was confused, and acted in an angry manner toward his wife; that, in his opinion, during this period she was of unsound mind; that, based on his observations of her during that time, in his opinion, she also was of unsound mind while in the hospital; that she left the hospital on February 18th, and was taken by the grandniece to the latter's home in Ramona; that thereafter he saw Mrs. Beckley on a number of occasions, which he described in detail, when she recognized him but was confused; that on one such occasion, in May following execution of her will, in response to a call from the grandniece, he went to the latter's home and found Mrs. Beckley lying on the floor in her own excrement; that thereupon he removed her from the home of the grandniece and took her to her own home because the grandniece was unable to care for her; that at this time, in his opinion, she was not of sound mind; that on this occasion the grandniece had said: "Larry (i.e., the proponent Kuebler) has talked Auntie into changing her will, leaving everything to me"; that thereafter she improved but at times still was confused and did not recognize him; and that on occasions after she left the hospital he had heard her speak in a loud, lamenting and wailing voice. Contestants also direct our attention to the testimony of a practical nurse at the hospital that on some occasions Mrs. Beckley would recognize her and on others she would not; that she had delusions about chasing wetbacks across the border and fighting Indians; and that on the night before the will was executed she was confused. Our attention also is directed to the testimony of a witness named Lawrence that Mrs. Beckley was confused upon her return to the latter's home in May, did not recognize the witness, was confined to bed, and acted like a child; to the testimony of a witness named Barrett, who cared for Mrs. Beckley thereafter, that the latter was confused, was of unsound mind, was "like a wild woman," and showed she disliked the grandniece whose presence would upset her; and to the testimony of a witness named Moore, who saw Mrs. Beckley at the home of the grandniece shortly after leaving the hospital, that she was not clear, told him she was leaving her estate to the "dogs and cats," from which it may be inferred that she was referring to the provisions in the former will leaving a part of her estate to the San Diego Humane Society, i.e., one of the contestants, and also told him that she owned all of the land in Pauma Valley, whereas she did not own any land at this place.

Although the testimony heretofore noted was contradicted by other testimony, and the inferences reasonably deducible therefrom in support of contestant's position were subject to rejection by virtue of other evidence, or other reasonably deducible inferences, the trial court was not entitled to determine these conflicts in passing upon the motion for nonsuit or a directed verdict.

"Testamentary incompetency on a given day . . . may be proved by evidence of incompetency at times prior to and after the day in question." (*Estate of Fosselman,* 48 Cal.2d 179, 185 [308 P.2d 336]; *Estate of Bourquin, supra,* 161 Cal.App.2d 289, 298; *Estate of Frank,* 102 Cal.App.2d 126, 130 [226 P.2d 767]; *Estate of Hartley,* 137 Cal.App. 630, 633 [31 P.2d 240].)

In the instant case the evidence presented by contestants concerning the mental condition of Mrs. Beckley before and after execution of the subject will, including the opinion of the intimate acquaintance McCown that she was of unsound mind while in the hospital, are sufficient to create an issue of fact as to whether at the time of such execution she had the mental capacity to understand the nature of the testamentary act in which she was engaged or to understand and recall the nature and situation of her property.

In support of their contention that the evidence is sufficient to sustain a finding of undue influence, contestants rely upon the rule that proof of a confidential relationship between a testatrix and a beneficiary who unduly profits by a will, coupled with activity on the part of the beneficiary in the preparation thereof, raises a rebuttable presumption of undue influence which must be overcome by the proponents, and results in an issue of fact, citing *Estate of Lances, supra,* 216 Cal. 397, 404; *Estate of Hall,* 158 Cal.App.2d 466, 474 [322 P.2d 1011]; *Estate of Gagliasso,* 150 Cal.App.2d 65, 68 [309 P.2d 513], and similar decisions. There is substantial evidence establishing a confidential relationship between Kuebler and Mrs. Beckley.

The proponents, in support of the order granting their motion for a directed verdict, rely upon the rule that the existence of a confidential relationship between a beneficiary and a testatrix, of itself, is not sufficient to raise a presumption of undue influence, but there must be an additional showing that the beneficiary actively participated in procuring the will (*Estate of Fritschi, supra,* 60 Cal.2d 367, 374), or, stated otherwise, "displayed activity in the preparation of the will . . . ." (*Estate of Presho,* 196 Cal. 639, 651 [238 P. 944].)

The primary issue at hand is whether there is any substantial evidence supporting the conclusions that Kuebler was active in the preparation of the subject will. An attorney named Boyer had prepared Mrs. Beckley's prior wills, and represented her in legal proceedings arising out of the death of Mr. Beckley which were pending at the time she was in the hospital. Atherton, the attorney who prepared the subject will, was a stranger to Mrs. Beckley, but had represented Kuebler on a number of occasions, and the evidence justifies the inference that he was the latter's attorney. Kuebler testified that Mrs. Beckley, sometime during her stay in the hospital, asked him to telephone her attorney, Boyer, and tell the latter that she wanted to talk to him, that she wanted to do something about her will; that on the day before her departure from the hospital, which was a Tuesday, he, Kuebler, called Boyer and was told by the latter that he could not come that day, and suggested that Kuebler get Atherton; that, thereafter he, Kuebler, related this information to Mrs. Beckley, who said it would be all right with her to get Atherton; and, thereupon, he called Atherton, who came to the hospital later that day. Atherton obtained the information from which he prepared the subject will in about 30 to 40 minutes; did not learn of the existence of the prior wills; did not inquire of Mrs. Beckley whether she had another attorney; did not advise her that he was Kuebler's attorney; and did not discuss with her the nature and extent of her property. The will was executed the next morning. There is evidence from which it may be concluded that Mrs. Beckley never received a copy of that will. Kuebler's version of the matter was contradicted in major respects by Boyer who testified that Kuebler telephoned and told him Mrs. Beckley wanted to make a new will, saying she then was living in Lakeside or Ramona, that he did not remember which, and wanted to know if Boyer would like to go out and see her on Saturday to discuss the matter with her; that Boyer told Kuebler he could not go on that particular Saturday, or that weekend, and that if the matter was to be taken care of then Kuebler would have to get another attorney; that thereupon Kuebler said he would have another attorney, a Keith Atherton, see Mrs. Beckley; and that he, Boyer, was not told and did not know that Mrs. Beckley then was in the Chula Vista Community Hospital which was less than one-half mile from his office. It would appear that, contrary to Kuebler's testimony, Boyer could have consulted

with Mrs. Beckley on the day in question at the hospital had he been requested to do so. Contestants contend that it may be inferred from the foregoing testimony that Kuebler preferred to have Atherton rather than Boyer talk to Mrs. Beckley; that he, in effect, chose Atherton for the preparation of the subject will; that he accomplished this result by not inquiring of Boyer whether he could talk to Mrs. Beckley on the Tuesday in question at the hospital, rather than on the following Saturday at Lakeside or Ramona, and by advising Mrs. Beckley that Boyer could not see her on that Tuesday; that Mrs. Beckley accepted Atherton as her attorney instead of Boyer in reliance upon a deceit practiced upon her by Kuebler; that the selection of Atherton was important to Kuebler because Atherton had acted as Kuebler's attorney; that Kuebler must have had a reason for the deception practiced on Mrs. Beckley; and the obvious reason therefor was the preparation of a will favoring him. Although there is an abundance of evidence justifying jury rejection of these inferences, the issue thus presented was one of fact for jury determination. (*Estate of Jamison,* 41 Cal.2d 1, 10 [256 P.2d 984].) The evidence upon which contestants rely brings this case within the rule raising a presumption of undue influence and requires a jury determination of that issue. (*Estate of Bourquin, supra,* 161 Cal.App.2d 289, 294, 300; *Estate of Gagliasso,* 150 Cal.App.2d 65, 68-69 [309 P.2d 513]; *Estate of Eakle,* 33 Cal.App.2d 379, 385-386 [91 P.2d 954].)

The evidence supporting application of the presumption of undue influence also supports the conclusion that the entire will was the product of such influence and, for this reason, invalidates the entire will. (*Estate of Webster,* 43 Cal.App.2d 6, 15 [110 P.2d 81].) As a consequence, the motion for nonsuit in behalf of the grandniece should not have been granted.

The judgment and order appealed from are reversed.

Brown (Gerald), P. J., and Finley, J. pro tem.,* concurred.

A petition for a rehearing was denied April 27, 1965, and respondents' petition for a hearing by the Supreme Court was denied May 26, 1965.

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.